IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| redT HOMES, LLC and redT CAPITAL PARTNERS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>CITY AND COUNTY OF DENVER,<br><br>Defendant. | CIVIL ACTION NO.: 1:25-cv-01681-PAB-TBO<br><br>SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

## INTRODUCTION

1. Plaintiff redT Homes is an award-winning Denver homebuilder that has earned a reputation building attainably-priced, LEED-certified, and sustainably-constructed homes for Denver residents. redT Homes's signature "LiteHomes," which are "Lite on Your Wallet and Lite on the Planet," exemplify the company's commitment to tackle the housing crisis plaguing its home city of Denver in an affordable and environmentally friendly way. Its sister company and co-plaintiff, redT Capital Partners (together, redT), owns properties which redT Homes develops.

2. Rather than embrace the efforts of builders like redT, the City and County of Denver (Denver) makes their work more difficult—and much more expensive—by inverting a fundamental law of economics: more supply means lower prices. Turning that axiom on its head, Denver reached the remarkable conclusion that its housing shortage is *caused by building more homes*. Thus, it refuses to issue development permits until homebuilders like redT—the very people resolving

housing affordability issues adding much-needed supply—pay a fee into Denver's affordable housing fund. For example, Denver imposed a fee of approximately $45,000 as a condition on redT's application to build two duplexes (the South Sherman Duplex Project) and a fee of approximately $25,000 as a condition on its application to build four single-family homes (the West Gill Single-Family Project). As an alternative to the fee condition, developers may instead choose to submit to a 99-year affordability deed-restriction.

3.  As a matter of logic, Denver cannot make housing more affordable by making it more expensive. As a matter of constitutional law, it cannot abuse its land-use permitting authority to take money or property from applicants in order to address problems that those applicants do not create. Under Supreme Court precedents in *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987), *Dolan v. City of Tigard*, 512 U.S. 374 (1994), *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013), and *Sheetz v. El Dorado Cnty.*, 601 U.S. 267 (2024), Denver cannot force land-use permit applicants to give up money or other property as a condition of granting a permit unless the money or property demanded is designed to mitigate some public problem that the applied-for development would create.

4.  This Complaint challenges Denver's Dedicated Fund for Affordable Housing Ordinance ("Linkage Fee Ordinance"), Denver Rev. Muni. Code (DRMC) Ch. 27, art. V, and its Mandatory Affordable Housing Ordinance ("Mandatory Housing Ordinance"), DRMC Ch. 27, art. X (together, the Ordinances). redT seeks a declaration that the requirements of the Ordinances respecting residential

2

development represent unconstitutional conditions both facially and as applied. It further seeks an injunction prohibiting Denver from imposing exactions under the Ordinances on developments done by redT, and an award of attorney fees and costs incurred in this action. Accordingly, redT Homes and redT Capital Partners allege as follows:

## JURISDICTION AND VENUE

5. This suit is filed pursuant to 42 U.S.C. § 1331 (federal question) as it arises under the Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1343(a)(4) (civil rights) as it seeks redress of civil rights violations under 42 U.S.C. § 1983.

6. This suit also seeks a remedy under the Declaratory Judgment Act, 28 U.S.C. § 2201.

7. The property that is the subject of this action is located, and the civil rights violations alleged herein took place, in Denver, Colorado. Therefore, venue is proper in this judicial district.

## PARTIES

8. Plaintiffs redT Homes and redT Capital Partners (together, redT) are limited liability companies organized and operating under the laws of the State of Colorado, and whose principal place of business is the State of Colorado. As owners and developers of residential property in Denver, they are subject to the challenged Ordinances.

9. Defendant City and County of Denver is a political subdivision of the State of Colorado, the local governing authority in Denver, and the party who

promulgates and enforces the unconstitutional policies, customs, and practices alleged herein.

## LEGAL BACKGROUND

### The Takings Clause and Land Use Permit Exactions

10. Under the Takings Clause of the Fifth Amendment to the United States Constitution, no government agency may take private property for a public use without paying just compensation. U.S. Const. amend. V (Takings Clause), XIV (applying Takings Clause to state and local governments). As a corollary to this rule, a government agency imposing a land-use permit condition that requires the dedication of private property, including money, "must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *Dolan*, 512 U.S. at 391; *see Koontz*, 570 U.S. 595 (holding that monetary exactions are subject to the same requirement). Specifically, the agency must carry the burden of showing that the exaction bears an "essential nexus" and "rough proportionality" to the public impacts of the proposed project, lest the exaction be nothing more than an "out-and-out plan of extortion." *Nollan*, 483 U.S. at 837; *Dolan*, 512 U.S. at 391.

### The Linkage Fee Ordinance

11. The Linkage Fee Ordinance sets out a program of development fees imposed on new development. A true and correct copy of Article V of Chapter 27 of Denver's Municipal Code is attached hereto as **Exhibit A**. This copy was downloaded on May 19, 2025, from library.municode.com/co/denver, which is linked from Denver's official website at denvergov.org/government/legislation-and-transparency. A true

4

and correct copy of the linkage fee schedule adopted pursuant to the Linkage Fee Ordinance, as made available on Denver's official website,[1] is attached hereto as **Exhibit B**.

12. Enforcement and application of the Ordinance is overseen by Denver's Department of Housing Stability, or HOST.

13. The Linkage Fee Ordinance applies to all residential developments containing fewer than ten dwelling units, with enumerated exceptions not relevant here. It also applies to commercial and industrial developments. DRMC §§ 27-153(a), -154.

14. At the time of the subject applications, and depending on the type of development, the fees required for the issuance of a building permit currently range from $1.99 to $7.22 per square foot of gross floor area. *Id.* § 27-153(a). For example, the South Sherman Duplex development was subject to a fee of $6.17 per square foot. By contrast, a commercial sales service development in a typical market area would have been charged a fee of $4.97 per square foot.

15. The fee schedule is designed to increase in July of each year. Thus, for example, beginning in July of 2025, the fee for a development like the South Sherman Duplex project increased from $6.17 per square foot to $8.00 per square foot. *Id.*

16. The Linkage Fee Ordinance provides that the executive director of HOST may reduce or waive the amount of linkage fees if an applicant "demonstrates that the required amount of fees exceeds the amount that would be needed to mitigate

---

[1] https://tinyurl.com/3uxjrrsh (last visited May 29, 2025).

5

the actual demand for affordable housing created by the development." *Id.* § 27-157(a).

17. According to the legislative findings contained in the Linkage Fee Ordinance, "[t]he extraordinary housing cost increases in Denver are driven, in part, by the pace of population and job growth in the city, resulting in a situation where demand for housing has far outpaced supply[.]" *Id.* § 27-151.

18. The legislature further found that new "residential and non-residential development is demonstrably associated with the generation of new jobs at various income levels, with the number of jobs associated with any particular development being correlated with the type and size of the development." *Id.* § 27-151(a). For this and other reasons, the city council "determined there is a direct nexus between both non-residential and residential development, job growth, and demand for new housing that is affordable[.]" *Id.* § 27-151(d).

19. These legislative findings are purportedly "supported by the 'Denver Affordable Housing Nexus Study' prepared for" Denver by "David Paul Rosen & Associates and dated September 8, 2016, the contents of which are expressly incorporated" in the Ordinance "as a part of the legislative findings of the city council." *Id.* § 27-151(h). The study is available from Denver's official website at: https://tinyurl.com/24wfy3a6 (last visited July 25, 2025).

20. The Nexus Study underlying the Linkage Fee Ordinance relies on the argument that new housing development creates economic activity which results in an increased workforce in need of housing.

6

21. It begins by estimating the sale or rent price of a "prototypical" residential unit and "moves through a series of linkages to the incomes of the households that purchase or rent the units, the annual expenditures of those households on goods and services, the jobs associated with the delivery of these goods and services, the income of the workers performing those jobs, the household income of those worker households, and finally to the affordability level of the housing needed by those worker households."

22. The linkage fees contained in the Ordinance are purportedly "supported by the 'Expanding Housing Affordability: Feasibility Analysis' prepared for the City and County of Denver by Root Policy Research and dated September 28, 2021, the contents of which are expressly incorporated" in the Ordinance "as part of the legislative findings of the city council." *Id.* § 27-151(i). The Executive Summary of this analysis is available from Denver's official website at: https://tinyurl.com/d8waaa98 (last visited July 25, 2025).

23. The Linkage Fee Ordinance provides, at DRMC § 27-153(c), that applicants for building permits to create structures containing dwelling units that are subject to the payment of the linkage fee "may voluntarily comply with [the] Mandatory Affordable Housing [Ordinance] rather than pay the required linkage fee."

### The Mandatory Housing Ordinance

24. The Mandatory Housing Ordinance sets out a program of property dedications imposed on new development. A true and correct copy of the Mandatory

7

Housing Ordinance, located at Chapter 27, Article X of Denver's Municipal Code, is attached hereto as **Exhibit C**.

25. The Mandatory Housing Ordinance applies to residential development consisting of at least ten new dwelling units. DRMC § 27-221 (applied to all "residential development"); *id.* § 27-219(t) (defining "residential development" as any project that would create ten or more new units at one location). It requires that such developments set aside a certain percentage of units ("income restricted units," or IRUs) to be provided only to "eligible households," *i.e.*, those households whose income is limited to a certain percentage of the area median income (AMI). *Id.* §§ 27-224, -219(a), (k).

26. Residential developments are divided into two categories—"high market" and "typical market"—based on the value of the underlying land. *Id.* §§ 27-224(a), -219(*l*), (u). Two compliance options are available within each category, allowing developers to select the amount of units to be set aside and adjusting the level of price control accordingly. For example, a "typical market" development may choose to set aside 10% of units to be rented at 60% AMI or sold at 80% AMI, or it may choose to set aside 15% of units to be rented at an average of 70% AMI or sold at an average of 90% AMI. *Id.* § 27-224(a).

27. If the formula for determining the number of IRUs required results in a fractional unit, the requirement is rounded up or down to the nearest whole unit, except that at least one unit must be provided. *Id.* § 27-224(g). Thus, for four-unit projects like the West Gill and South Sherman projects seeking to comply with the

8

Mandatory Housing Ordinance in lieu of paying a linkage fee, one IRU per project—in practice, 25% of units—is required.

28. The Mandatory Housing Ordinance provides baseline incentives for compliance, including a permit fee reduction and reduced minimum parking requirements. *Id.* § 27-224(c). Developments which elect to exceed the mandatory minimum IRU requirements may also qualify for "enhanced incentives." *Id.* § 27-224(c).

29. Developments containing IRUs, or the IRUs themselves, must "carry deed restrictions, restrictive covenants, or other forms of affordability restriction[.]" *Id.* § 27-224(e).

30. IRUs must be maintained at affordable rates for a minimum term of 99 years, *id.* § 27-224(f)(1), and must actually be occupied by an eligible household whose income is at or below the applicable AMI limit. *Id.* § 27-224(f)(3).

31. It is unclear how the requirements specified in ¶ 30 apply if the renters or owners of an IRU experience an increase in income that exceeds the AMI limit.

32. As an alternative to the "on-site" compliance described above, developments may satisfy the Ordinance by paying a fee in-lieu. *Id.* § 27-225. These fees are calculated differently from those in the Linkage Fee Ordinance, and range from $250,000 to $478,000 for each of a certain percentage of units depending on the market area classification and the specific type of residential development at issue.

33. The Mandatory Housing Ordinance also provides that applicants may propose "negotiated alternative" compliance methods which may be accepted at the

9

discretion of the executive director of HOST in consultation with the director of the department of community and planning development. The applicant must "demonstrate how the proposed negotiated alternative provides outcomes that better support the goals of the HOST strategic plan, comprehensive plan goals, and any small area plan applicable to the residential development." *Id.* § 27-226(a).

34. The Mandatory Housing Ordinance includes a non-exclusive list of contemplated negotiated alternatives, including the dedication of land, adjustment to the number, affordability-level, or features of IRUs, and the provision of off-site IRUs. *Id.* § 27-226(b).

35. According to the legislative findings contained in the Mandatory Housing Ordinance, "[m]arket forces, including continued population growth and unmet demand for new housing, result in highly priced housing, and a lack of economic incentive for developers to offer a more diversified price range of housing, and therefore such housing is not being created at a level that meets current demand." *Id.* § 27-217(c). Moreover, "[r]apid regional growth and a strong housing demand have combined to make land and construction costs higher, limiting the areas where affordable housing is located." *Id.* § 27-217(d). Meanwhile, "[n]aturally occurring housing . . . has declined significantly in recent years[,] thereby necessitating a program to assist in the development of affordable housing." *Id.* § 27-217(h).

**FACTUAL ALLEGATIONS**

36. redT Homes is a residential real estate development firm located in Denver, Colorado, whose mission is to develop sustainably built and attainably priced

10

homes.

37. The firm's portfolio includes a variety of residential projects ranging from single-family "LiteHomes"[2] to 25-unit townhomes and apartments. Their achievements in environmentally sustainable development have earned them the 2023 Xcel Energy Sustainable New Housing Program Award for the best individual electric-only builder overall. *See* redThomes.com, *redT Homes Honored as Best Individual Electric Only Builder Overall in 2023 Xcel ESNH Program*, https://redthomes.com/blog/best-electric-only-builder/.

38. The firm's commitment to sustainable, attainable housing makes them a major player in helping to address Denver's housing shortage, which is estimated at approximately 100,000 units as of November 2023. *See* Aldo Svaldi, *Colorado is Short Over 100,000 Housing Units Despite Help from Construction Surge, Slow Population Growth*, Denver Post (Nov. 29, 2023, 2:45 PM), https://tinyurl.com/mt5tmbth.

39. redT Homes has applied for and will continue to apply for development permits for projects that are subject to both the Linkage Fee Ordinance and the Mandatory Housing Ordinance.

40. For example, redT Homes is seeking development approval for the West Gill Single Family project, which consists of four single-family residences of three

---

[2] redT's LiteHomes are "newly constructed, LEED Gold Certified (or higher) single-family, duplex, and townhome residences" designed to be "Lite on your wallet and Lite on the planet." redThomes.com, *What are LiteHomes?*, https://www.redthomes.com/litehomes (last visited May 29, 2025).

11

bedrooms each located at 1245, 1251, 1255, and 1261 W. Gill Place. The property is owned by redT Capital Partners, LLC.

41. The project will require approximately $24,962.56 under the Linkage Fee Ordinance (at $3.92 per square foot of gross floor area).

42. redT Homes is also seeking development approval for the South Sherman Duplex project, which consists of two "ying-yang" style duplexes (for a total of four units) located at 2140 and 2144 S. Sherman Street in Denver. Two of these units consist of three bedrooms each, while the other two consist of between two and three bedrooms each.

43. The South Sherman Duplex properties were formerly owned by NMA DLA Investment Properties, LLC (NMA), which is another sister company to redT. However, in part due to the financial strain of the Ordinances, NMA sold the property to a third party in April 2025. If not for the Ordinances' effect on the cost of development, NMA could have obtained a significantly higher price for the sale.

44. Regardless, redT Homes is the party responsible for actually paying the fees associated with the Linkage Fee Ordinance to Denver.

45. The South Sherman Duplex project will require approximately $44,917.60 under the Linkage Fee Ordinance (at $6.17 per square foot of gross floor area).

46. The difference between the fee per square foot charged in the two projects is due to the fact that the units in the South Sherman Duplex project are more than 1,600 square feet each, while the units in the West Gill Single Family

12

project are less than 1,600 square feet each. Under the linkage fee schedule, development fees change depending on whether the units are above or below that square footage threshold.

47. Both projects are certified "Gold" by LEED (Leadership in Energy & Environmental Design), the most widely used green building rating system in the world.

48. On February 19, 2025, redT Homes applied for a waiver from the Linkage Fee Ordinance in connection with both the South Sherman Duplex project and the West Gill Single Family project. The waiver requests stated, in part, that the "proposed linkage fee may inadvertently hinder the development of housing in areas where affordable housing is most needed. This will have a negative impact on the community that we are trying to enhance in these locations through the provision of much needed housing." A true and correct copy of the waiver request forms are attached as **Exhibit D**.

49. On March 13, 2025, Denver responded with a denial of the waiver request. True and correct copies of these denials are attached as **Exhibit E**.

50. Under Linkage Fee Ordinance Section 27-153(c), redT may be allowed to avoid payment of the linkage fee, but only by complying with the Mandatory Housing Ordinance.

51. Unlike the Linkage Fee Ordinance, the Mandatory Housing Ordinance makes no provision for applicants to request a waiver from its requirements.

52. Although the Mandatory Housing Ordinance does contemplate negotiated alternatives, each of the illustrative examples enumerated in the Ordinance requires the dedication of a property interest, either in the form of land itself or an adjustment of the number, affordability-level, location, or features of IRUs. The Mandatory Housing Ordinance also provides for fees in-lieu. For the projects at issue, such fees would be significantly higher than those imposed by the Linkage Fee Ordinance. None of the alternatives provide any opportunity to avoid an exaction altogether.

53. Denver has therefore made a final and definitive decision that the West Gill Single Family and South Sherman Duplex projects cannot obtain development permits unless redT dedicates property interests to Denver.

54. Denver has not made, and cannot make, an individualized determination that the conditions imposed by the Ordinances are related in both nature and extent to the impact of the proposed developments.

## CLAIM FOR RELIEF

### Unconstitutional Exaction
### 42 U.S.C. § 1983, 28 U.S.C. § 2201

55. All preceding allegations of this Complaint are incorporated by reference in this section as though fully set forth herein.

56. The Civil Rights Act of 1871, 42 U.S.C. § 1983, provides that a person "shall be liable to the injured party" when, acting under the authority of a statute or ordinance, he or she deprives an individual of a right secured by the U.S. Constitution.

14

57. Denver is a person under 42 U.S.C. § 1983.

58. Denver acted under color of the Linkage Fee Ordinance when it conditioned permit approval for the South Sherman Duplex project and the West Gill Single Family project on a requirement that redT Homes pay linkage fees of $44,917.60 and $24,962.56 respectively.

59. Denver has an established policy or custom of applying the Ordinance to exact property interests for the purposes of promoting affordable housing from permit applicants seeking to create housing units.

60. redT Homes and redT Capital Partners are citizens of the United States or persons within the jurisdiction thereof, within the meaning of those terms in 42 U.S.C. § 1983.

61. redT Homes and redT Capital Partners possess rights, privileges, and immunities secured by the Constitution and laws of the United States, including, but not limited to:

   a. The right, privilege, or immunity to build on their own property, even if subject to Denver's legitimate permitting requirements. *Nollan*, 483 U.S. at 834 n.3.

   b. The right, privilege, or immunity to control and dispose of their property, including by sale or by lease, at a price of their choosing.

   c. The right, privilege, or immunity to not have their private property taken by Denver for public use, without just compensation. U.S. Const. amends. V, XIV.

15

    d. The right, privilege, or immunity to be free of deprivations of their property by Denver without due process of law. U.S. Const. amend. XIV.

    e. The right, privilege, or immunity to not be forced by the City to forgo one constitutional right in order to enjoy another, or to choose between which constitutional rights they wish to exercise.

    f. The right, privilege, or immunity to be free from complying with unconstitutional conditions on land-use permits.

    g. The right, privilege, or immunity to not comply with the Linkage Fee Ordinance or the Mandatory Housing Ordinance unless and until the City makes some sort of individualized determination that the required dedication is related both in nature and extent to the impact of redT's proposed developments. *Dolan*, 512 U.S. at 391.

62. The doctrine of unconstitutional conditions, as set out by *Nollan*, *Dolan*, *Koontz*, and *Sheetz*, is a federal doctrine designed to enforce the primacy of the Fifth and Fourteenth Amendments to the U.S. Constitution against state and local governments in the land-use permitting context. As such, a violation of the doctrine of unconstitutional conditions is actionable under 42 U.S.C. § 1983.

63. Denver imposed unconstitutional conditions on the South Sherman and West Gill projects, and it routinely imposes unconstitutional conditions on residential development by redT and others under the Ordinances.

64. The Linkage Fee Ordinance demands property in the form of money linked to a specific, identifiable property interest—*i.e.*, the specific parcels of real property for which development permits are sought

65. The Mandatory Housing Ordinance demands property in the form of dedications of several protected property interests, including (1) a financial interest in the affected units; (2) the right of free alienation, control, and disposal; and (3) the right to lease or sell property at a fair market price.

66. It also takes a servitude in the form of a restrictive covenant for a term of 99 years.

67. Under the Doctrine of Unconstitutional Conditions, the government may demand property or money as a condition of approving a land-use permit only if:

    a. The property is needed to directly mitigate a public impact that would be directly caused by the development (the "essential nexus" test); and

    b. The amount of property is roughly proportionate in magnitude to the public impact(s) of the development (the "rough proportionality" test).

68. Both the essential nexus test and the rough proportionality test require heightened constitutional scrutiny.

69. To meet its burden under these tests, the government must make "some sort of individualized determination that the required dedication is related both in

nature and extent to the impact of the proposed development." *Dolan*, 512 U.S. at 391.

70. The Ordinances fail these constitutional standards with respect to residential development, both facially and as applied, because new residential development, including redT's projects at issue in this suit:

    a. Neither creates nor contributes to the need for affordable housing;

    b. Does not cause anybody else to be unable to afford housing; and

    c. Alleviates housing affordability problems by creating new housing.

71. Because new residential development categorically does not have a negative public impact on housing affordability, there is no set of circumstances in which the Ordinances could satisfy *Nolan* and *Dolan*.

72. Although the Linkage Fee Ordinance is supported by a Nexus Study, that Study is insufficient to justify the policy for several reasons:

    a. It fails to account for the downward pressure that new supply puts on pricing;

    b. It fails to account for the "filtering" effect of new housing supply, by which existing units are freed up by new units, and by which new units become more affordable over time;

    c. It fails to establish the causal relationship between new residential development and increased workforce housing demands on which it relies; and

      d. It cannot explain why new commercial and industrial development is sometimes subject to lower fees than new residential development, despite the fact that new commercial and industrial development is naturally more directly related to increased workforce housing demands.

73. redT did not have, and Denver did not provide, any other lawful alternative to the conditions imposed by the Ordinances.

74. redT suffered a cognizable constitutional injury the moment Denver demanded that they accede to unconstitutional conditions on the issuance of their development permits.

75. Legal remedies, such as monetary damages, are inadequate and alone cannot restore redT's constitutional right to be free from the challenged conditions.

76. redT are entitled to equitable relief as allowed by 42 U.S.C. § 1983, and they are additionally entitled to declaratory relief under 28 U.S.C. § 2201.

## Relief Sought

WHEREFOR, Plaintiffs respectfully request that this Court grant the following relief:

A. A judgment that the Linkage Fee Ordinance and Mandatory Housing Ordinance violate the doctrine of unconstitutional conditions with respect to residential developments both facially and as applied to the South Sherman Single Family and West Gill Duplex projects; and that redT suffered a violation of their civil rights when Denver conditioned the

19

approval of their projects on its forfeiture of the right to just compensation for property taken;

B. Equitable relief in the form of an injunction prohibiting Denver from enforcing the Ordinances against redT Homes and/or redT Capital Partners LLC, and an Order directing Denver to issue the subject permits without conditions imposed by the Ordinances;

C. An award of reasonable attorneys' fees for bringing and maintaining this action under 42 U.S.C. § 1988;

D. An award of costs of suit pursuant to Fed. R. Civ. P. 54(d); and

E. Any other relief that the Court deems just and proper under the circumstances.

DATED: August 18, 2025.

Respectfully submitted,

AUSTIN W. WAISANEN*
WY Bar No. 8-7023
Pacific Legal Foundation
3100 Clarendon Blvd., Ste. 1000
Arlington, VA 22201
(202) 888-6881
AWaisanen@pacificlegal.org
*admitted only in the State of Wyoming

/s/ David J. Deerson
DAVID J. DEERSON
CA Bar No. 322947
Pacific Legal Foundation
3100 Clarendon Blvd.
Suite 1000
Arlington, VA 22201
(202) 888-6881
DDeerson@pacificlegal.org

*Counsel for Plaintiffs*