# EXHIBIT A

DIVISION 1. - AFFORDABLE HOUSING PERMANENT FUNDS

Sec. 27-150. - Sources and uses of fund revenue.

(a) *Dedicated revenues.* The affordable housing permanent funds shall consist of the Affordable
Housing Linkage Fee Revenue Fund created for the exclusive purpose of receiving and accounting
for all revenues derived from the affordable housing linkage fees provided in division 2 of this
article V and the Affordable Housing Property Tax and Other Local Revenue Fund created for the
purpose of receiving and accounting for revenues derived from the portion of the city's property
taxes and retail marijuana sales taxes dedicated for affordable housing programs, as provided in
subsections (i) and (j) of this section, as well as donations, cash transfers from other funds, and
other local revenue sources.

(b) *Permitted uses of revenue in the Affordable Housing Linkage Fee Revenue Fund.* Revenue
received in the Affordable Housing Linkage Fee Revenue Fund shall be used exclusively for the
following purposes:

(1) To increase the supply of affordable rental housing, including the funding of renter assistance
programs, for qualified households earning eighty (80) percent or less of AMI, in response to
increased housing demand linked to new construction and new employment.

(2) To increase the supply of for-sale housing for qualified households earning eighty (80) percent
or less of AMI, in response to increased housing demand linked to new construction and new
employment.

(3) To support homebuyer assistance programs, including by way of example down payment and
mortgage assistance programs, for qualified households earning eighty (80) percent or less of
AMI, in response to increased housing demand linked to new construction and new
employment.

(c) *Permitted uses of revenue in the Affordable Housing Property Tax and Other Local Revenue Fund.*
Revenue received in the Affordable Housing Property Tax and Other Local Revenue Fund shall be
used exclusively for the following purposes:

(1) For the production or preservation of rental housing, including the funding of rental
assistance programs, for qualified households earning eighty (80) percent or less of AMI.

(2) For the production or preservation of for-sale housing for qualified households earning one
hundred (100) percent or less of AMI.

(3) For homebuyer assistance programs, including by way of example down payment and
mortgage assistance programs, for qualified households earning one hundred and twenty
(120) percent or less of AMI.

(4)

For the development and preservation of supportive housing for homeless persons, and for supportive services associated with supportive housing; provided, however, in no event shall the amount expended from the Affordable Housing Property Tax and Other Local Revenue Fund for supportive services under this paragraph (4) exceed ten (10) percent of the amount appropriated by the city council to the fund for that year.

(5) For programs supporting low-income at-risk individuals in danger of losing their existing homes, for mitigation of the effects of gentrification and involuntary displacement of lower income households in those neighborhoods of the city that are most heavily impacted by rapidly escalating housing costs, for homeowner emergency repairs, or for other housing programs.

(d) *Cap on administrative costs.* Monies in the affordable housing permanent funds may be expended to pay the costs incurred by the city associated directly with the administration of the funds; provided, however, in no event shall the amount expended from the funds for such administrative expenses in any year exceed eight (8) percent of the amount of revenue received in the Affordable Housing Linkage Fee Revenue Fund that year and shall not exceed eight (8) percent of the amount appropriated by the city council to the Affordable Housing Property Tax and Other Local Revenue Fund that year.

(e) *Fund earnings.* Any interest earning on any balance in either of the affordable housing permanent funds shall accrue to that fund.

(f) *Administration of funds.* The affordable housing permanent funds shall be administered by the executive director of the department of housing stability, in coordination with the recommendations and assistance of the housing stability strategic advisors as provided in division 3 of this article V. The executive director may promulgate rules and regulations consistent with this article V governing the procedures and requirements for expenditures from the funds. Expenditures from the funds shall be made in accordance with the adopted three- to five-year strategic plan for the funds as provided in subsection 27-164(a).

(g) *Definition of AMI.* As used in this section, the term "AMI" means the area median income, adjusted for household size, for the Denver metropolitan area as determined by the U.S. Department of Housing and Urban Development.

(h) *Review of article.* No later than December 31, 2021, the department of housing stability shall conduct a policy review of this article V, hold a public hearing to gather input for the review, and report the findings and any recommendations to the city council.

(i) *Dedicated levy for Affordable Housing Property Tax and Other Local Revenue Fund.* For 2016 property taxes to be collected in 2017, the city's certification of property tax mill levies shall include a separate itemized levy at the rate of one-half of one mill (.5 mill) for the purpose of funding affordable housing programs through the Affordable Housing Property Tax and Other

Local Revenue Fund. For 2017 property taxes to be collected in 2018, and in each subsequent year, the city shall continue to maintain a separately itemized levy to fund affordable housing programs and, as provided in subsection 20-26(d), shall adjust the levy annually in coordination with the adjustment other city levies to the extent necessary to comply with the city property tax revenue limitation.

(j) *Dedicated portion of marijuana sales tax revenues.* All revenue collected by the city pursuant to section 53-92 shall be remitted to the Affordable Housing Property Tax and Other Local Revenue Fund as provided in subsection (a) of this section and used exclusively for the purposes in subsection (c) of this section.

(Ord. No. 625-16, § 1, 9-19-16; Ord. No. 864-18, § 1, 8-27-18; Ord. No. 47-20, §§ 31—33, 3-16-20)

DIVISION 2. - LINKAGE FEES

Sec. 27-151. - Legislative findings and intent.

The city council has determined that Denver is experiencing an unprecedented escalation in housing costs, and thus a critical lack of housing opportunities for households with low or moderate incomes. In recent years, Denver has ranked at or near the top of national reports of U.S. cities in terms of inflation in housing costs. The declining availability of low and moderately priced housing in Denver forces persons employed in the city to either spend a disproportionate percentage of their disposable income on housing, thus sacrificing other necessities of life, or forces them to seek housing opportunities outside the city. Households living outside of the city spend additional time and resources commuting, which leads to stress, increased child-care requirements, and increased air pollution. The extraordinary housing cost increases in Denver are driven, in part, by the pace of population and job growth in the city, resulting in a situation where demand for housing has far outpaced supply, especially for persons who may find jobs in Denver's growing economy but are employed at low or moderate income levels.

The city council has determined that it is in the public interest to address the severe social and economic impacts to the city and its citizens caused by the increasing gap between supply and demand for housing for funding programs designed to preserve and increase the supply of affordable housing available to low and moderate income households. The city council specifically finds that it is appropriate to fund a portion of the costs of such programs from a linkage fee on new development for the following reasons:

(a) New residential and non-residential development is demonstrably associated with the generation of new jobs at various income levels, with the number of jobs associated with any particular development being correlated with the type and size of the development.

(b) When jobs at a low or moderate income level are generated as a direct consequence of new non-residential development, employees receiving such incomes will experience a lack of housing availability and affordability in Denver under current market conditions unless efforts

are taken by the city to increase housing opportunities to keep pace with job growth.

(c)  The city council also specifically finds that job growth associated with new residential development is directly related to the income and spending capacity of the household occupying the residence and that the size of the residence, as measured in gross floor area, correlates with the income and spending capacity of the residents, thus causing a larger residence to drive more job growth and more concomitant secondary housing demand than a smaller residence.

(d)  For the foregoing reasons, the city council has determined there is a direct nexus between both non-residential and residential development, job growth, and demand for new housing that is affordable to households with low or moderate incomes.

(e)  The city council acknowledges that monetary exactions on new development cannot exceed an amount that is justified by the impacts caused by the development. The city council has determined that the fees set forth herein fall far below the amount of revenue that would actually be necessary to meet the demand for new affordable housing driven by the job growth that is associated with new development, and thus these fees do not exceed the applicable standards that define the maximum legally justifiable fee.

(f)  The city council further acknowledges that the revenue derived from the fees provided herein must be used, not to address the existing gap between supply and demand for affordable housing in the city, but instead to mitigate future increases in the gap caused by new construction which will lead to new employment opportunities in the city, and the increased demand for affordable housing associated with such employment.

(g)  The city council has determined to set the affordable housing linkage fees set forth herein at a level much lower than those imposed by other cities, in an effort to ensure that the fees do not impair the feasibility of any development project in the city.

(h)  The foregoing findings are supported by the "Denver Affordable Housing Nexus Study" prepared for the City and County of Denver by David Paul Rosen & Associates and dated September 8, 2016, the contents of which are expressly incorporated herein as a part of the legislative findings of the city council.

(i)  The linkage fees set forth in division 2 of this article are supported by the "Expanding Housing Affordability: Feasibility Analysis" prepared for the City and County of Denver by Root Policy Research and dated September 28, 2021, the contents of which are expressly incorporated herein as a part of the legislative findings of the city council.

(j)  The city council has further determined that, since Denver does not impose nearly the range or amount of development impact fees as are imposed by virtually every other municipality throughout the Denver metropolitan area, the fees set forth herein will not place the city at a

competitive disadvantage in relation to neighboring jurisdictions in terms of accommodating future population growth and economic development.

(Ord. No. 625-16, § 1, 9-19-16; Ord. No. 47-20, § 34, 3-16-20; Ord. No. 426-22, § 1, 6-6-22)

Sec. 27-152. - Definitions.

The following words and phrases, as used in this division 2, have the following meanings:

(a) *Dwelling unit; dwelling, single unit; dwelling, two-unit;* and *dwelling, multi-unit* shall have the same meaning as these terms are used in article 11 of the Denver Zoning Code.

(b) *Gross floor area (GFA)* shall have the same meaning as the term is defined in the International Building Code, excluding parking garages and any other structures or areas used exclusively for the storage or parking of vehicles.

(c) *Primary agricultural uses* shall have the same meaning as the term is used in article 11 of the Denver Zoning Code.

(d) *Primary civic, public and institutional uses* shall have the same meaning as the term is used in article 11 of the Denver Zoning Code.

(e) *Primary commercial sales, services and repair uses* shall have the same meaning as the term is used in article 11 of the Denver Zoning Code.

(f) *Primary industrial, manufacturing and wholesale uses* shall have the same meaning as the term is used in article 11 of the Denver Zoning Code.

(g) *Primary residential use* shall have the same meaning as the term is defined in article 11 of the Denver Zoning Code, and shall be deemed to include any and all primary residential uses and all uses accessory to a primary residential use, except accessory dwelling units, as set forth in article 11 of the Denver Zoning Code.

(h) *Structure* shall have the same meaning as the term is defined in article 13 of the Denver Zoning Code, but shall not include any partially enclosed or open structures such as porches, balconies, courtyards, and similar structures.

(Ord. No. 625-16, § 1, 9-19-16; Ord. No. 426-22, § 1, 6-6-22)

Sec. 27-153. - Imposition of linkage fee.

(a) *In general*. Except as provided in <u>section 27-154</u>, an affordable housing linkage fee shall be imposed prior to the issuance of a building permit for any new structure or for any addition to an existing structure that increases the gross floor area of the existing structure, according to the following fee schedule:

| Use Within a Structure | Fee Per square foot of GFA | | | |
|---|---|---|---|---|
| | Effective July 1, 2022 | Effective July 1, 2023 | Effective July 1, 2024 | Effective July 1, 2025 |
| Dwelling unit(s) of 1,600 square feet or less of GFA within a single-unit dwelling, two-unit dwelling, or multi-unit dwelling or live/work dwelling of 9 dwelling units or less. | $1.75 | $2.83 | $3.92 | $5.00 |
| Dwelling unit(s) of more than 1,600 square feet of GFA within a single-unit dwelling, two-unit dwelling, or multi-unit dwelling, or live/work dwelling of 9 dwelling units or less. | $2.50 | $4.33 | $6.17 | $8.00 |
| Any primary residential use other than dwelling units. | $2.25 | $3.83 | $5.42 | $7.00 |
| Any primary commercial sales services and repair uses or any primary civic public or institutional uses in a typical market area as typical market area is defined in section 27-219. | $2.90 | $3.93 | $4.97 | $6.00 |

| | | | | |
|---|---|---|---|---|
| Any primary commercial sales services and repair uses or any primary civic, public or institutional uses in a high market area as high market area is defined in <u>section 27-219</u>. | $3.65 | $5.43 | $7.22 | $9.00 |
| Any primary industrial, manufacturing and wholesale uses or any primary agricultural uses. | $0.96 | $1.47 | $1.99 | $2.50 |

(b) *Mixed use structures; split properties.* When a structure is proposed to be constructed and used for any combination of the uses set forth in subsection (a) of this section, the required linkage fee shall be determined based upon an apportionment of the gross floor area in the structure attributable to each of the proposed uses. When a structure is proposed to be constructed upon any property that is partially subject to either of the exceptions to applicability of the fee as set forth in subsection <u>27-154</u>(a), (b) or (k), the required linkage fee shall be applied only to the gross floor area of construction that is physically located outside of the portion of the property to which the exception applies.

(c) *Voluntary compliance with Mandatory Affordable Housing, Article X, <u>Chapter 27</u>.* An applicant for a building permit for any structure that contains dwelling units that would be subject to the payment of the linkage fee may voluntarily comply with Mandatory Affordable Housing, Article X, <u>Chapter 27</u> rather than pay the required linkage fee.

(d) *Modification of existing structures.* The linkage fees imposed by this section shall not be required for the issuance of building permits associated with any improvement, repair, remodeling, tenant finish, or any other modifications to an existing structure unless the modification increases the gross floor area of the structure.

(e) *Annual inflation adjustment; future fee increases.*

(1) On July 1, 2026, and on each July 1 thereafter, the fees set forth in subsection (a) of this section shall be adjusted in an amount equal to the percentage change from the previous calendar year in the CPI-U. The adjustments will be reflected in a fee schedule issued by the executive director (manager) of the department of community planning and development and made publicly available in advance of the fees becoming effective. The annual inflation

adjustment shall apply to and be collected in conjunction with the issuance of any building permit on or after July of the year in which the adjustment is made, regardless of when the application for the building permit was made.

(2)  As used in subsection (e), the term "CPI-U" means the United States Department of Labor Statistics (Bureau of Labor Statistics) Consumer Price Index for All Urban Consumers, All items, for the Denver-Aurora-Lakewood, Colorado metropolitan area (1982-84-100). In the event that the CPI-U is substantially changed, renamed, or abandoned by the United States Government, then in its place shall be substituted the index established by the United States Government that most closely resembles the CPI-U, as determined by the executive director of the department of housing stability.

(3)  Except as provided in paragraph (1) of this section, the fees set forth in this section shall not be increased prior to January 1, 2028. On and after January 1, 2028, the fees set forth in this section shall not be increased in excess of the inflation adjustments set forth in subsection (2) unless and until the city commissions another study to evaluate whether the fee increase will affect the economic feasibility or any type of development to which the fee increase is proposed to be applied.

(Ord. No. 625-16, § 1, 9-19-16; Ord. No. 47-20, § 35, 3-16-20; Ord. No. 426-22, § 1, 6-6-22)

Sec. 27-154. - Exceptions.

The payment of linkage fees as set forth in section 27-153 shall not be required for the issuance of a building permit under any of the following circumstances:

(a)  Construction upon any property which is, alone or in combination with other properties, the subject of a contractual commitment or covenant that is dated and properly recorded prior to the imposition of a linkage fee on the first structure on the property and is enforceable by the city to construct affordable housing, including by way of example any development or subdivision agreement which includes an affordable housing covenant and to which the city is a party, any city-approved plan to build moderately priced development units (MPDUs) under article IV of this chapter 27, any city-approved plan to build affordable units in place of the linkage fee, any high impact development compliance plan executed and recorded pursuant to article X, division 3 of this chapter 27 where a payment of fees to support affordable housing development is contained in the high impact development compliance plan, or an affordable housing plan executed to meet incentive requirements under article VI of this chapter 27. The exception provided by this subsection (a) shall apply only for so long as such contractual commitment or covenant to construct affordable housing remains in effect. Construction upon property that, alone or in combination with other properties, was originally developed under such a contractual commitment or covenant and is substantially proposed for redevelopment shall be subject to payment of linkage fees hereunder unless the

redevelopment is governed by a new contractual commitment or covenant to construct affordable housing, or otherwise qualifies for an exception under any other provision of this section.

(b)  Construction upon any property subject to an obligation as a condition of zoning to provide affordable housing on the property.

(c)  Structures that are constructed with the support of any combination of federal, state or local financial resources, including private activity bonds, tax credits, grants, loans, or other subsidies to incentivize the development of affordable housing, including support from the affordable housing permanent funds created in <u>section 27-150</u>, and that are or will be restricted by law, contract, deed, covenant, or any other legally enforceable instrument to provide housing units only to income-qualified households. This exception shall apply to any housing project financed or constructed by or on behalf of the Denver Housing Authority.

(d)  Residential dwelling units that are built by any charitable, religious, or other nonprofit entity and deed-restricted to ensure the affordability of the dwelling unit to low and moderate income households.

(e)  Structures that are built by any charitable, religious or other nonprofit entity and that are primarily used to provide, shelter, housing, housing assistance, or related services to low income households or persons experiencing homelessness.

(f)  Construction by or on behalf of the federal, state or local governments or any department or agency thereof, to the extent any or all of the gross floor area in the structure will be used solely for a governmental or educational purpose.

(g)  Any structure that is being reconstructed up to the legally established gross floor area due to involuntary demolition or involuntary destruction as defined in article 13 of the Denver Zoning Code, but which also includes involuntary manmade forces.

(h)  An addition of four hundred (400) square feet of gross floor area or less to an existing structure containing a single-unit dwelling or a two-unit dwelling.

(i)  Accessory dwelling units as defined in article 11 of the Denver Zoning Code.

(j)  Any gross floor area of a structure containing an education use as defined in article 11 of the Denver Zoning Code, including any student housing operated by an education use.

(k)  Any gross floor area of a structure containing residential development, as defined in <u>section 27-219</u>, that is subject to Mandatory Affordable Housing, article X of this <u>Chapter 27</u>.

(Ord. No. 625-16, § 1, 9-19-16; Ord. No. 1407-18, § 7, 12-17-18; Ord. No. 47-20, § 36, 3-16-20; Ord. No. 426-22, § 1, 6-6-22; Ord. No. 1154-24, § 1, 9-30-24)

Sec. 27-155. - Reserved.

**Editor's note—** Ord. No. 426-22, § 1, adopted June 6, 2022, repealed § 27-155. Former § 27-155 pertained to build alternative and derived from Ord. No. 625-16, § 1, adopted September 19, 2016 and Ord. No. 47-20, §§ 37, 38, adopted March 16, 2020.

Sec. 27-156. - Collection and remittance of linkage fees; reporting.

(a) The responsibility for the calculation and collection of linkage fees shall reside with personnel in the department of community planning and development, and the fees required by this division shall be collected in conjunction with the administration of the city's system for issuing building permits. Any and all linkage fees applicable to a construction project shall be paid in full prior to the issuance of any building permit, excluding the shoring or excavation permit, for that project. For projects such as townhomes where units receive separate building permits, fees shall be assessed on a permit-by-permit basis. All fees collected by the department shall be remitted to the affordable housing linkage fee revenue fund as provided in section 27-150 and used exclusively for the purposes set forth therein.

(b) If, after the issuance of a building permit and collection of the applicable linkage fee but before the issuance of a certificate of occupancy, the amount of gross floor area of the construction project increases or a decision is made by the applicant to change the use of the structure to a use category for which a higher linkage fee would be imposed under section 27-153, then the applicant shall be required to pay additional linkage fees in compliance with this division.

(c) Any dispute over the applicability or calculation of the linkage fees may be appealed by the applicant for a building permit to the executive director (manager) of the department of community planning and development, who shall determine such appeals in consultation with the executive director of the department of housing stability.

(d) Linkage fees previously paid by an applicant at building permit issuance may be refunded from the affordable housing linkage fee revenue fund if it is later determined on appeal or otherwise by the executive director (manager) of community planning and development that the fees were not due and owning under this division, if a decision is made by the applicant after a building permit has been issued to reduce the gross floor area of the construction project or to change the use of the structure to a use category for which a lower linkage fee would be imposed under section 27-153, or if the building permits for the project lapse or are relinquished by the applicant without the project building built. The executive director (manager) of community planning and development shall not be obligated to make any refund under this subsection (d) unless the applicant files a written request for a refund with the executive director within sixty (60) days from the day any grounds for a refund arise.

(e) After a building permit has been issued and the applicable linkage fees have been paid, no additional fees shall be required under either of the following circumstances:

(1)   If the original building permit is cancelled in order to issue a replacement building permit to change the general contractor; or

(2)   If modified drawings for the construction project are submitted and logged in for review, so long as the modified drawings do not increase the overall gross floor area of the project.

(f)   The departments of community planning and development and housing stability shall provide a publicly available online resources to report on linkage fee funds collected, how linkage fee funds were spent, and approved reductions and waivers as enabled in section 27-157.

(Ord. No. 625-16, § 1, 9-19-16; Ord. No. 47-20, § 39, 3-16-20; Ord. No. 426-22, § 1, 6-6-22)

Sec. 27-157. - Reductions and waivers.

(a)   The executive director of the department of housing stability may reduce or waive the amount of linkage fees that would otherwise be imposed upon a specific development under section 27-153 if the applicant for a reduction or waiver demonstrates that the required amount of fees exceeds the amount that would be needed to mitigate the actual demand for affordable housing created by the development. An application for such a reduction or waiver shall include information showing the reduced affordable housing impacts created by the development, based upon the actual characteristics of the development including, for example:

(1)   The unique characteristics and space utilization of the workforce that will occupy a non-residential development and the demand of that particular workforce for affordable housing;

(2)   A non-residential development that will involve a structure built for and suitable solely for a specific use involving few or no employees; or

(3)   The unique characteristics of the residents who will occupy a residential development, and the likelihood those particular residents, due to their disposable household income or projected spending patterns, will not drive additional employment requiring additional affordable housing.

(b)   The executive director shall promptly notify in writing the executive director (manager) of the department of community planning and development of any reduction or waiver or linkage fees granted under the authority of this section.

(c)   If the requested reduction or waiver has not been approved or denied by the time of building permit issuance, then the applicant for a reduction or waiver request may pay the linkage fees in accordance with section 27-153. If a reduction or waiver is approved by the executive director after payment of linkage fees, or later determined on appeal, then the appropriate amount of linkage fees already paid by the applicant will be refunded.

(Ord. No. 625-16, § 1, 9-19-16; Ord. No. 47-20, § 40, 3-16-20; Ord. No. 426-22, § 1, 6-6-22)

Sec. 27-157.5. - Regulations.

The director of the department of housing stability and the director of the department of community planning and development may cooperatively adopt rules and regulations to administer this division.

(Ord. No. 426-22, § 1, 6-6-22)

<u>EXHIBIT B</u>

# Current Fee Schedule

| Project Type | Fee per square foot, Effective 7/1/22 | Effective 7/1/23 | Effective 7/1/24 | Effective 7/1/25 |
|---|---|---|---|---|
| **Single Unit, Two Unit, or Multi Unit of 9 units or fewer AND 1,600 square feet (sf) or less per unit** | $1.75 | $2.83 | $3.92 | $5.00 |
| **Single Unit, Two Unit, or Multi Unit of 9 units or fewer AND more than 1,600 sf per unit** | $2.50 | $4.33 | $6.17 | $8.00 |
| **All other residential uses (e.g., congregate living)** | $2.25 | $3.83 | $5.42 | $7.00 |
| **Commercial sales, services and repair, civic, public or institutional -typical market area** | $2.90 | $3.93 | $4.97 | $6.00 |
| **Commercial sales, services and repair, civic, public or institutional -high market area** | $3.65 | $5.43 | $7.22 | $9.00 |
| **Industrial, manufacturing, wholesale and agricultural** | $0.96 | $1.47 | $1.99 | $2.50 |

Fee changes are published here and in the 📄 <u>building permit fee policy</u> (PDF, 162KB).

# EXHIBIT C

ARTICLE X. - MANDATORY AFFORDABLE HOUSING

DIVISION 1. - GENERAL

Sec. 27-217. - Legislative findings.

The city council hereby finds that a severe housing problem continues to exist within Denver with respect to the supply of housing relative to the need for affordable housing. Specifically, the city council finds that:

(a) Demographics and analyses of new housing indicate that a large majority of private development is geared toward high-priced housing development and does not serve households earning less than one hundred (100) percent of area median income;

(b) Development trends produce high-priced housing which does not serve a large segment of the population and limits housing available to low- and moderate-income households, thus failing to implement the housing goals of the HOST Strategic Plan, Comprehensive Plan 2040, and Blueprint Denver, calling for a city that is equitable, affordable, and inclusive;

(c) Market forces, including continued population growth and unmet demand for new housing, result in highly priced housing, and a lack of economic incentive for developers to offer a more diversified price range of housing, and therefore such housing is not being created at a level that meets current demand;

(d) Rapid regional growth and a strong housing demand have combined to make land and construction costs higher, limiting the areas where affordable housing is located;

(e) Incomes of Denver's growing workforce has not kept pace with this rapid and significant increase in the cost of housing in Denver;

(f) Ensuring a mix of incomes and access to homeownership and rental housing opportunities for low- and moderate-income households are high priorities for the city, and therefore the city has a strong interest in ensuring that the city's limited supply of developable land provides housing opportunities for all incomes of the workforce;

(g) Land in Denver is highly limited and without a program requiring affordable housing to be built, it is unlikely based on current trends, new development will create affordable housing, leaving Denver residents without sufficient affordable housing;

(h) Naturally occurring affordable housing, which is housing that may rent or sell at an affordable rate without affordability restrictions, has declined significantly in recent years thereby necessitating a program to assist in the development of affordable housing;

(i)

The city has deployed multiple funding strategies and programs which are successful in creating new affordable housing, but not at a pace sufficient to meet the growing demand of the workforce; and

(j)  Providing incentives to new development will improve the economic feasibility of providing a minimal percentage of affordable housing units as an integral part of new residential developments.

(Ord. No. 426-22, § 2, 6-6-22)

Sec. 27-218. - Declaration of public policy.

The city council hereby declares it to be the public policy of the city to:

(a)  Exercise the authority granted to the city pursuant to HB 21-1117 to regulate development in order to promote the construction of new affordable housing units;

(b)  In compliance with HB 21-1117, the city has demonstrated the following actions to increase the overall number and density of housing units within the city:

(1)  Changing its zoning regulations to increase the number of housing units allowed on a particular site;

(2)  Promoting mixed-use zoning that permits housing units be incorporated in a wider range of developments;

(3)  In certain zones, permitting more than one dwelling unit per lot in traditional single-family lots;

(4)  Increasing the permitted household size in single-family homes;

(5)  Promoting denser housing development near transit stations and places of employment;

(6)  Granting reduced parking requirements to residential or mixed-use developments that include housing near transit stations or affordable housing development;

(7)  Granting density bonuses to development projects that incorporate affordable housing units;

(8)  Materially reducing or eliminating certain utility charges, regulatory fees, or taxes imposed by the city applicable to affordable housing units; and

(9)  Granting affordable housing development material regulatory relief from any type of zoning or land development regulations that would ordinarily restrict the density of new development.

(c)  Encourage the construction of new affordable housing units alongside market rate housing units within mixed income residential developments by offering incentives to increase the overall supply and availability of housing;

(d)  Provide property owners or land developers with alternatives to the construction of new affordable housing units as required by HB 21-1117;

7/24/25, 4:47 PM                                         Denver, CO Code of Ordinances

(e)  Implement the comprehensive plan goal to create a Denver that's equitable, affordable, and inclusive;

(f)  Increase the availability of additional low- and moderate-income housing to address existing and anticipated future housing needs of the workforce in Denver and the unmet needs of residents in Denver; and

(g)  Ensure diverse housing options continue to be available for households earning at or below the area median income.

(Ord. No. 426-22, § 2, 6-6-22)

Sec. 27-219. - Definitions.

The following words and phrases, as used in this article, have the following meanings:

(a)  *AMI* or *area median income* means the median income for the Denver metropolitan area, adjusted for household size, as calculated by the U.S. Department of Housing and Urban Development.

(b)  *Affordable housing plan* means a plan approved by the executive director of the department of housing stability outlining the number and type of income restricted units to be provided when an applicant elects to build income restricted units on-site as required by this article.

(c)  *Affordable housing project* means a residential rental or ownership development in which the number of affordable units for that project is at least equal to the number and affordability level of IRUs otherwise required under section 27-224(c).

(d)  *Applicant* means any person, firm, partnership, association, joint venture, corporation, or any other entity or combination of entities, or affiliated entities and any transferee of all or part of the real property at one location that submits an application for a project that would provide a total of ten (10) or more new dwelling units at one location in Denver.

(e)  *At one location* means all real property under common ownership or control by the applicant if:

(1)  The properties are contiguous at any point;

(2)  The properties are separated only by a public or private right-of-way or utility corridor right-of-way, at any point; or

(3)  The properties are separated only by other real property owned by the applicant which is not subject to this article at the time of any building permit(s), site development plan, subdivision, or other zoning development application by the applicant.

(f)  *Building permit* means any residential or commercial construction permit issued for the construction of any structure, foundation and/or superstructure or any similar term used to issue permits for such work as the terminology may be modified by the department of

community planning and development. A building permit does not include permits for shoring or excavation and any associated permits for such work as electrical, mechanical, plumbing or similar permits.

(g)  *Comprehensive plan* means the Denver Comprehensive Plan 2040 or its successor.

(h)  *CPI-U or Consumer Price Index* means the United States Department of Labor Statistics (Bureau of Labor Statistics) Consumer Price Index for All Urban Consumers, All items, for the Denver-Aurora-Lakewood Colorado area (1982-84=100). In the event that the CPI-U is substantially changed, renamed, or abandoned by the United States Government, then in its place shall be substituted the index established by the United States Government that most closely resembles the CPI-U, as determined by the executive director of the department of housing stability.

(i)  *Director* means the executive director of HOST or executive director's designee.

(j)  *Dwelling unit* shall have the same meaning as defined in article 11 of the Denver Zoning Code.

(k)  *Eligible household* means (i) a household whose income qualifies them to rent or purchase an IRU and who holds a valid verification of eligibility from HOST; and (ii) nonprofit organizations designated by the director and governmental or quasi-governmental bodies who rent or purchase an IRU for the purpose of renting or selling an IRU to a household whose income qualifies them to rent or purchase the IRU.

(l)  *High market area* means census tracts in the City and County of Denver with the highest land values compared to the citywide median land value. Classification of high market areas shall be periodically updated as set forth in the rules and regulations.

(m)  *High impact development* means any combination of residential, non-residential, or mixed-use structures that are built as a part of a development where the development:

    (1)  Will be built on ten (10) or more acres; or

    (2)  Is using a city-approved financing tool, such as tax increment financing or a metropolitan district.

(n)  *HOST* means the department of housing stability of the City and County of Denver or its successor.

(o)  *HOST strategic plan* means the three- to five-year strategic plan or its successor as required by section 27-164(a).

(p)  *IRU or income-restricted unit* means a dwelling unit required by this article to be affordable as set forth in section 27-224, a negotiated alternative, or a high impact development compliance plan.

(q)  *On-site* means at the same location of a residential development.

(r)  *Ownership development* means a residential development where dwelling units are offered for sale.

Case No. 1:25-cv-01681-PAB-TPO    Document 11-1    filed 08/18/25    USDC Colorado
pg 21 of 42

(s)  *Rental development* means a residential development where dwelling units are offered for rent.

(t)  *Residential development* means any project that would create ten (10) or more new dwelling units at one location by (i) the construction or alteration of structures or (ii) the conversion of a use within an existing structure to a residential use containing dwelling units from any other non-residential use. If a project has both residential and non-residential uses, the residential portion of a project shall be considered a residential development if it would create ten (10) or more new dwelling units.

(u)  *Typical market area* means census tracts in the City and County of Denver that are not identified as high market areas. Classification of typical market areas shall be periodically updated as set forth in the rules and regulations.

(v)  *Townhouse* shall have the same meaning as defined in the International Residential Code (IRC).

(Ord. No. 426-22, § 2, 6-6-22; Ord. No. 1154-24, § 2, 9-30-24)

## Sec. 27-220. - Special revenue fund.

(a)  The director shall use the Mandatory Affordable Housing Special Revenue Fund for the primary purpose of offsetting the costs of the building permit fee reduction incentive provided in <u>section 27-224</u>. Any amounts in the special revenue fund remaining after offsetting such costs shall then be used for the following purposes, with prioritization being given to utilize such funds generated from areas vulnerable to displacement in areas vulnerable to displacement:

(1)  For the production or preservation of rental housing, including the funding of rental assistance programs, for qualified households earning eighty (80) percent or less of AMI.

(2)  For the production or preservation of for-sale housing for qualified households earning one hundred (100) percent or less of AMI.

(3)  For homebuyer assistance programs, including by way of example, down payment and mortgage assistance programs, for qualified households earning one hundred twenty (120) percent or less of AMI.

(b)  As used in this section, "areas vulnerable to displacement" means neighborhoods identified as meeting all three (3) indicators as defined in Appendix C—Key Equity Concepts Methodology of Blueprint Denver, a supplement to the comprehensive plan. In the event that the methodology or data source is substantially changed, renamed, or abandoned by community planning and development, then in its place shall be substituted a methodology that most closely resembles the original intent as determined by the executive director of the department of community planning and development.

(c)

Case No. 1:25-cv-01681-PAB-TPO    Document 11-1    filed 08/18/25    USDC Colorado
pg 22 of 42

*Cap on administrative costs.* Monies in the Mandatory Affordable Housing Special Revenue Fund may be expended to pay the costs incurred by the city associated directly with the administration of this fund; provided, however, in no event shall the amount expended from the special revenue fund for such administrative expenses in any year exceed the greater of eight (8) percent of the balance in the fund on January 1 of each year or five hundred thousand dollars ($500,000.00).

(d)  *Fund earnings.* Any interest on any balance in the Mandatory Affordable Housing Special Revenue Fund shall accrue to this fund.

(e)  *Administration of fund.* The Mandatory Affordable Housing Special Revenue Fund shall be administered by the director.

(Ord. No. 426-22, § 2, 6-6-22)

DIVISION 2. - MANDATORY AFFORDABLE HOUSING FOR RESIDENTIAL DEVELOPMENTS

Sec. 27-221. - Applicability.

(a)  This division is applicable to all residential developments. If a residential development project provides both residential and non-residential uses, this division shall be applicable to the residential development portion of the project and the portion of the project that is not a residential development shall be subject to Chapter 27, Article V, Division 2.

(b)  In determining whether a residential development contains the applicable total number of dwelling units for the purpose of applying this article, all real property at one location within Denver under common ownership or control of the applicant, including real property owned or controlled by separate entities in which any person or family of an applicant owns ten (10) percent or more of the ownership interest shall be included. An applicant shall not avoid this article by submitting piecemeal applications or approval requests for subdivision plats, site development plans, zone lot amendments, or building permits. Any applicant may submit a development proposal that intends construction of dwelling units, including applications for subdivision plats, site development plans, zone lot amendments, or building permits, for less than the applicable number of dwelling units at any time; but the applicant shall agree in writing that upon the next such application or request the applicant will comply with this article when the total number of dwelling units at one location has reached the applicable number of dwelling units.

(Ord. No. 426-22, § 2, 6-6-22)

Sec. 27-222. - Exceptions.

Compliance with this division shall not be required for a residential development under any of the following circumstances:

(a)  Construction upon any property which is, alone or in combination with other properties, the subject of a contractual commitment or covenant that is properly recorded and is enforceable by the city to construct affordable housing, including by way of example any development or subdivision agreement which includes an affordable housing covenant and to which the city is a party, any city-approved plan to build moderately priced development units (MPDUs) under article IV of this <u>chapter 27</u>, any city-approved plan to build affordable units in place of the linkage fee, or an affordable housing plan executed to meet incentive requirements under former Article VI of this <u>Chapter 27</u>. The exception provided by this subsection (a) shall apply only for so long as such contractual commitment or covenant to construct affordable housing remains in effect. Construction upon property that, alone or in combination with other properties, was originally developed under such a contractual commitment or covenant and is substantially proposed for redevelopment shall be subject to the requirements of this section here under unless the redevelopment is governed by a new contractual commitment or covenant to construct affordable housing, or otherwise qualifies for an exception under any other provision of this section.

(b)  Construction upon any property subject to an obligation as a condition of zoning to provide affordable housing on the property.

(c)  Affordable housing projects that are or will be restricted by law, contract, deed, covenant, or any other legally enforceable instrument.

(d)  Residential developments that are built by any charitable, religious, or other nonprofit entity and deed restricted to ensure the affordability of the dwelling units to low- and moderate-income households.

(e)  Any structure that contained a residential development that is being reconstructed up to the legally established gross floor area due to involuntary demolition or involuntary destruction as defined in Article 13 of the Denver Zoning Code, but which also includes involuntary man-made forces.

(f)  Projects that are high impact developments, which shall instead be required to comply with division 3.

(Ord. No. 426-22, § 2, 6-6-22)

Sec. 27-223. - Compliance requirements.

An applicant may satisfy its requirement under this division by:

(a)  Providing IRUs on-site of the residential development as set forth in <u>section 27-224</u>; or

(b)  Making a payment of the fee-in-lieu as set forth in <u>section 27-225</u>; or

(c)  Entering into a negotiated alternative as set forth in <u>section 27-226</u>.

(Ord. No. 426-22, § 2, 6-6-22)

Sec. 27-224. - On-site compliance requirements.

(a)  *Base on-site compliance.* Applicants electing to provide income restricted units on-site may satisfy its requirements by providing the number of IRUs at the income-restricted levels in accordance with the options set forth below, as the applicant may choose, as follows:

| Market Area | Applicant Compliance Options | Minimum percent of total dwelling units to be IRUs | Maximum AMI for eligible households | |
| --- | --- | --- | --- | --- |
| High Market Area | H-1B | 10% of total dwelling units | Rental development 60% of AMI | Ownership developments: 80% of AMI |
| | H-2B | 15% of total dwelling units | Rental developments: An effective average of 70% of AMI | Ownership developments: An effective average of 90% of AMI |
| Typical Market Area | T-1B | 8% of total dwelling units | Rental developments: 60% of AMI | Ownership developments: 80% of AMI |
| | T-2B | 12% of total dwelling units | Rental developments: An effective average of 70% of AMI | Ownership developments: An effective average of 90% of AMI |

Case No. 1:25-cv-01681-PAB-TPO    Document 11-1    filed 08/18/25    USDC Colorado    pg 25 of 42

(b) *Base incentives for on-site compliance.*

    (1) To promote the construction of on-site IRUs, an applicant providing IRUs on-site pursuant to the requirements in subsection (a) is eligible for the following incentives for the applicable residential development:

        a. *Permit fee reduction.* An applicant will receive a building permit fee reduction of six thousand five hundred dollars ($6,500.00.00) per IRU in a typical market area and ten thousand dollars ($10,000.00) per IRU in a high market area. The building permit fee reduction shall not exceed fifty (50) percent of the total building permit fee.

        b. Reduced minimum vehicle parking required by the Denver Zoning Code. An applicant may utilize the alternative minimum vehicle parking ratios allowed in article 10 of the Denver Zoning Code.

        c. Commercial, sales service and repair street level exemption to linkage fee. An applicant may receive an exemption from the requirement to pay a linkage fee for the gross floor area of a primary commercial sales, services, and repair use located on the street level of a structure. As used in this subsection, the terms "primary commercial sales, services, and repair use" shall have the same meaning as the term is defined in article 11 of the Denver Zoning Code and "Street level" shall have the same meaning as the term is defined in article 13 of the Denver Zoning Code.

    (2) Notwithstanding the applicability of this division, any residential development that is exempt pursuant to underline section 27-222(c) or (d) may receive the base incentives set forth in this section.

(c) *Enhanced on-site compliance; incentives.*

    (1) *Enhanced incentives.* To increase the overall supply of housing and encourage applicants to provide on-site IRUs in excess of the base requirements specified in subsection (a), an applicant is eligible for the incentives set forth in a. through c. of this subsection if the applicant provides IRUs as follows:

| Market Area | Applicant Compliance Options | Minimum percent of total dwelling units to be IRUs | Maximum AMI for eligible households |
| --- | --- | --- | --- |

| High Market Area | H-1E | 12% of total dwelling units | Rental developments: 60% of AMI | Ownership developments: 80% of AMI |
|---|---|---|---|---|
| | H-2E | 18% of total dwelling units | Rental developments: An effective average of 70% of AMI | Ownership developments: An effective average of 90% of AMI |
| Typical Market Area | T-1E | 10% of total dwelling units | Rental developments: 60% of AMI | Ownership development: 80% of AMI |
| | T-2E | 15% of total dwelling units | Rental developments: An effective average of 70% of AMI | Ownership developments: An effective average of 90% of AMI |

    a. *Access to base incentives.* An applicant is eligible for the base incentives for on-site compliance set forth in section 27-224(b)(1).

    b. *Height and floor area increase.* A residential development shall be entitled to an increase in building height and floor area ratio in accordance with the provisions set forth in articles 8 and 10 of the Denver Zoning Code.

    c. *Vehicle parking exemption.* A residential development shall be entitled to a vehicle parking exemption in accordance with the provisions set forth in article 10 of the Denver Zoning Code.

(2) Notwithstanding the applicability of this division, any residential development that is exempt pursuant to section 27-222(c) or (d) may receive the enhanced incentives set forth in this subsection if the residential development provides the percentage of IRUs specified in subsection (c)(1).

(d)

*Affordable housing plan submission.* An applicant who chooses to provide IRUs on-site pursuant to this section shall submit an affordable housing plan to HOST. The affordable housing plan must be submitted in conjunction with the formal site development plan or, if no site development plan is required, at time of the applicable permit application. The director shall review the proposed affordable housing plan for consistency with the requirements of this article prior to approval of the site development plan or applicable permit. The director shall approve, approve with conditions, or reject the affordable housing plan. A site development plan or applicable permit may not be approved until an affordable housing plan is approved by the director.

(e)  *Covenant restriction.* Residential developments, specific IRUs, or both, shall carry deed restrictions, restrictive covenants, or other forms of affordability restrictions, in the form approved by the director. No temporary or final certificate of occupancy shall be issued until a deed restriction, restrictive covenant, or other form of affordability restriction is recorded in the real property records of the Clerk and Recorder for the City and County of Denver and encumbers the residential development or IRUs, as applicable.

(f)  *Minimum standards and requirements for on-site IRUs.*

(1)  *Length of affordability.* IRUs must be maintained as affordable for a minimum term of ninety-nine (99) years.

(2)  IRUs must be (i) functionally equivalent in construction and appearance to other dwelling units at the residential development; (ii) interspersed among other dwelling units at the residential development; (iii) proportionate to the number of bedrooms of the other dwelling units at the residential development; and (iv) compliant with all rules and regulations adopted by the director.

(3)  IRUs in rental developments must be made affordable to and occupied by eligible households whose incomes are at or below the applicable AMI limit.

(4)  IRUs in ownership developments must be made available for purchase at an affordable price to eligible households whose incomes are at or below the applicable AMI limit.

(5)  The city may require an eligible household that purchases an IRU in an ownership development to record a performance deed of trust or a lien on the IRU.

(6)  The AMI limit associated with each IRU will be identified as a part of the affordable housing plan and will remain subject to such limitation for the duration of the term of affordability.

(g)  *Rounding.* In calculating the number of on-site IRUs required pursuant this section, rounding shall be used such that five-tenths (0.5) or greater shall result in requiring that a whole unit shall be produced; provided, however, that at least one (1) unit shall be provided if the calculation results in less than five-tenths (0.5). By way of example, if a requirement is for 8.3 IRUs, the number of on-site IRUs would be eight (8). Alternatively, if a requirement is for 8.7 IRUs, the number of on-site IRUs would be nine (9).

(h) *Effective average.* For applicants selecting to meet compliance options H-2B, T-2B, H-2E or T-2E, applicants may elect to serve eligible households earning eighty (80) percent or less of AMI for rental developments and one hundred (100) percent or less of AMI for ownership developments, so long as the average AMI for all on-site IRUs remains at seventy (70) percent of AMI for rental developments and ninety (90) percent of AMI for ownership developments.

(Ord. No. 426-22, § 2, 6-6-22; Ord. No. 1154-24, § 3, 9-30-24)

Sec. 27-225. - Alternative compliance—Fee-in-lieu.

(a) An applicant may satisfy its requirements under this division by making a fee-in-lieu payment that will be deposited in the Mandatory Affordable Housing Revenue Fund.

(b) *Fee-in-lieu calculation.*

(1) *Calculation of fee-in-lieu.* The fee-in-lieu shall be calculated pursuant to the table below by multiplying the number of IRUs that would be required by the fee per IRU:

| Market Area | Percent of IRUs to be used for the free calculation | Development Type | Fee per IRU required |
|---|---|---|---|
| High Market Area | 10% of dwelling units | Rental development | $311,000.00 |
| | | Ownership development | $478,000.00 |

| Typical Market Area | 8% of total dwelling units | Townhouses | $250,000.00 |
| | | Ownership development, dwelling units other than townhouses | $408,000.00 |
| | | Rental development of one to seven stories | $250,000.00 |
| | | Rental development of eight or more stories | $295,000.00 |

(2) *Rounding.* In calculating the fee to be paid pursuant this section, rounding shall be used such that five-tenths (0.5) or greater shall result in requiring that a whole unit shall be produced; provided, however, that a unit of one (1) IRU shall be used if the calculation results in less than five tenths (0.5). By way of example, if a calculation results in 8.3 IRUs, the fee per IRU required would be multiplied by eight (8). Alternatively, if a calculation results in 8.7 IRUs, the fee per IRU required would be multiplied by nine (9).

(c) *Remittance and collection of payment.* The calculation and collection of the fees-in-lieu shall be the responsibility of the department of community planning and development. Fees-in-lieu shall be collected in conjunction with the administration of the city's system for issuing building permits. Any and all fees-in-lieu applicable to a project shall be paid in full prior to the issuance of any building permit, excluding the shoring or excavation permit, for the project.

(d) *CPI-U adjustment.* On July 1, 2023, and annually thereafter, the amounts set forth in subsection (b)(1) in the Fee per IRU required column shall be adjusted in an amount equal to the percentage change from the previous calendar year's CPI-U. The adjustments will be reflected in a fee-in-lieu schedule issued by the director of the department of community planning and development and be made publicly available in advance of the fees becoming effective. The annual inflation adjustment shall apply to and be collected in conjunction with the issuance of any building permit on or after July 1 of the year in which the adjustment is made, regardless of when the application for the building permit was made.

(Ord. No. 426-22, § 2, 6-6-22)

Sec. 27-226. - Alternative compliance—Negotiated alternatives.

(a)  An applicant may propose an alternative manner to satisfy its requirements under this division. The proposed negotiated alternative must be submitted in conjunction with the formal site development plan or, if no site development plan is required, at time of the applicable permit application. The applicant shall demonstrate how the proposed negotiated alternative provides outcomes that better support the goals of the HOST strategic plan, comprehensive plan goals, and any small area plan applicable to the residential development. The director, in consultation with the director of the department of community planning and development, shall review the proposed negotiated alternative and approve, approve with conditions, or reject the negotiated alternative. Each negotiated alternative shall contain information as set forth below and in any rules and regulations adopted pursuant to this article, a statement that the terms of the negotiated alternative will bind the applicant and will run with the land upon approval of the director and recording with the clerk and recorder of the City and County of Denver.

(b)  A negotiated alternative may include a combination of one or more of, but not be limited to, the following:

(1)  The dedication of land for the provision of affordable housing. At a minimum, the market value of the land to be dedicated must exceed the total fee-in-lieu required for the residential development and must have zoning entitlement in place to enable for the provision of affordable housing.

(2)  An affordable housing plan to provide fewer IRUs on-site but at a greater depth of affordability. In any such negotiated alternative, at a minimum, the total percent of IRUs shall not be less than five percent (5%) of total dwelling units and the majority of IRUs must serve households earning fifty (50) percent of area median income or less.

(3)  An affordable housing plan that would provide fewer IRUs on-site but the IRUs would have a greater number of bedrooms than would otherwise be required. In any such negotiated alternative, at a minimum, the total percent of IRUs shall not be less than five (5) percent of total dwelling units and the majority of IRUs must be two (2), three (3), or four (4) bedroom units. The development must also contain family-friendly services and amenities. Amenities may include, but are not limited to, child-care; play area; community garden; and other on-site amenities to serve families.

(4)  An agreement to provide off-site IRUs concurrently with the construction of the residential development within the same statistical neighborhood or a ¼-mile radius of the site. In any such negotiated alternative, the total percent of IRUs that must be provided for the residential development accessing this option shall not be less than the enhanced on-site compliance standards requirements for both properties set forth in the section 27-224(c).

(c)

An applicant is eligible for the base incentives for on-site compliance set forth in <u>section 27-224</u>(b)(1) when the residential development is providing IRUs on-site.

(d)  The director may grant access to the enhanced incentives for on-site compliance set forth in <u>section 27-224</u>(c)(1)when the residential development is providing IRUs on-site. The negotiated alternative better supports the goals of the HOST strategic plan, comprehensive plan goals, and any small area plan applicable to the residential development compared to the enhanced on-site compliance requirements of <u>section 27-224</u>(c)(1), and the applicant provides at least one of the following:

(1)  A greater percentage of IRUs than would otherwise be required for enhanced on-site compliance based on the residential development's market area and compliance option, with the maximum AMI for eligible households detailed in the negotiated alternative; or

(2)  A maximum AMI for eligible households that is lower than would otherwise be required for enhanced on-site compliance based on the residential development's market area with the percentage of IRUs detailed in the negotiated alternative; or

(3)  IRUs with a greater number of bedrooms than is otherwise required in <u>section 27-224</u>(f)(2).

(e)  The provisions of <u>section 27-224</u>(e) and (f) are applicable to any IRUs that are provided on-site of the residential development.

(Ord. No. 426-22, § 2, 6-6-22; Ord. No. 1154-24, § 4, 9-30-24)

DIVISION 3. - HIGH IMPACT DEVELOPMENTS


Sec. 27-228. - Applicability.

This division shall apply to all high impact developments.

(Ord. No. 426-22, § 2, 6-6-22)


Sec. 27-229. - High impact developments.

(a)  Owners or developers of a high impact development must submit to HOST a high impact development compliance plan that demonstrates how it will satisfy the intent and purposes of division 2 of this article and <u>Chapter 27</u>, Article V, Division 2.

(1)  The high impact development compliance plan shall demonstrate how the proposed development meets or exceeds the relevant standards set forth in this article; <u>Chapter 27</u>, Article V, Division 2; and the goals of the HOST strategic plan, comprehensive plan goals, and any small area plan applicable to the area of high impact development.

(2)

The owner or developer must provide to HOST documentation detailing outreach to the surrounding community, including, but not limited to, the organizations and individuals engaged, and how the proposed high impact development compliance plan is responsive to the conducted community outreach.

(3) The high impact development compliance plan may include a combination of one or more of, but not be limited to, the following:

   a. A plan to provide IRUs within the area of high impact development sufficient to meet or exceed one of the compliance options set forth in <u>section 27-224</u>(c).

   b. The dedication of land within the area of the high impact development for the provision of affordable housing. In any such case, at a minimum, the land dedicated must be of sufficient size and have zoning entitlement in place to reasonably produce IRUs sufficient to meet the compliance requirements set forth in <u>section 27-224</u>(c).

   c. A plan to provide IRUs within the area of high impact development at a greater depth of affordability than the compliance requirements set forth in <u>section 27-224</u>(c). In any such case, at a minimum, the total percent of IRUs provided in the high impact area shall not be less than eight (8) percent of total dwelling units and the majority of IRUs must serve households earning fifty (50) percent of area median income or less.

   d. A plan to provide IRUs within the area of high impact development specifically designed to meet the needs of families and larger households. In any such case, at a minimum, the total percent of IRUs provided in the high impact development area shall not be less than eight (8) percent of total dwelling units and the majority of IRUs must include two (2), three (3), or four (4) bedrooms. The development must also contain family-friendly services and amenities. Amenities may include, but are not limited to, child-care; play area; community garden; and other on-site amenities to serve families.

(4) The director may grant access to the base incentives for on-site compliance set forth in <u>section 27-224</u>(b)(1) when the project is providing IRUs within the area of high impact development.

(5) The director may grant access to the enhanced incentives for on-site compliance set forth in <u>section 27-224</u>(c)(1) if the high impact development compliance plan proportionally meets or exceeds the on-site IRU requirements set forth in <u>section 27-224</u>(c). Alternatively, the director may grant access to the enhanced incentives for on-site compliance set forth in <u>section 27-224</u>(c)(1) when the project is providing IRUs within the area of high impact development, the high impact development compliance plan better supports the goals of the HOST strategic plan, comprehensive plan goals, and any small area plan applicable to the residential development compared to the enhanced on-site compliance requirements of <u>section 27-224</u>(c)(1), and the applicant provides at least one of the following:

   a.

A greater percentage of IRUs than would otherwise be required for enhanced on-site compliance based on the residential development's market area and compliance option, with the maximum AMI for eligible households detailed in the high impact development compliance plan; or

    b.  A maximum AMI for eligible households that is lower than would otherwise be required for enhanced on-site compliance based on the residential development's market area with the percentage of IRUs detailed in the high impact development compliance plan; or

    c.  IRUs with a greater number of bedrooms than is otherwise required in <u>section 27-224</u>(f)(2).

(b)  The director may waive the application of this division if the applicant requests such a waiver and demonstrates that circumstances unique to the proposed development limit or eliminate the practical application of this division. In such a case, the high impact development would instead be subject to the requirements of Division 2 of this article and <u>Chapter 27</u>, Article V, Division 2, as applicable.

(c)  The director shall review the high impact compliance plan and approve, approve with conditions, or reject the high impact development compliance plan. The director shall collaborate with the Denver Urban Renewal Authority when reviewing the compliance plan for a high impact development leveraging tax increment financing. The approved high impact development compliance plan shall result in an agreement to be signed by the owner or owners of the entire subject property, or the authorized agent of the owner or owners in advance of city council approval of city financing tools, if applicable, and shall be recorded with the clerk and recorder of the City and County of Denver.

(d)  For all high impact development compliance plans required under this section, no building permits shall be approved or issued for any structure within a high impact development area until the high impact development compliance plan is approved, executed, and recorded.

(Ord. No. 426-22, § 2, 6-6-22; Ord. No. 1154-24, § 5, 9-30-24)

DIVISION 4. - REGULATIONS, ENFORCEMENT, AND REPORTING


Sec. 27-230. - Regulations, enforcement, and reporting.

(a)  The director of the department of housing stability and the director of community planning and development may cooperatively adopt rules and regulations to administer this article.

(b)  Any violation of this article or rules and regulations adopted hereunder is subject to the penalties described under <u>section 1-13</u>(e). Pursuant to <u>section 1-13</u>(e), the city may impose a civil fine on applicants in an amount up to one hundred fifty (150) percent of the value of the IRU required but not provided.

(c)  The director may take legal action to enjoin or void any transfer of an IRU if any party to the transfer does not comply with all requirements of this article or the rules and regulations promulgated hereunder. The director may recover any funds improperly obtained from any sale or rental of an IRU in violation of this article.

(d)  The department of housing stability shall have the authority to enforce the affordability requirements imposed on IRUs.

(e)  The departments of community planning and development and housing stability shall provide a publicly available online resources to report on the outcomes of this article, including, but not limited to, number and types of units created, fee-in-lieu fund revenues, and spending allocations.

(Ord. No. 426-22, § 2, 6-6-22)

Secs. 27-231—27-239. - Reserved.

# EXHIBIT D

City and County of Denver Dept of Housing Stability

Response to Waiver of Linkage Fee Request

3/13/2025

LOG numbers: 2024-LOG-0012965 & 2024-LOG-0012975
Locations: 2140-2144 Sherman

Applicant – Benjamin Walker – Sr. Architectural Project Manager – redT Homes

Dear Benjamin Walker,

We have reviewed your waiver request for 2140-2144 Sherman and determined that the project does not qualify for a linkage fee waiver. The linkage fee is based on the nexus between new development and the need for affordable housing in the city.  To receive a reduction or waiver of the linkage fee, the applicant must demonstrate that the required linkage fee is greater than the amount of fee needed to mitigate the actual demand for affordable housing created by the development. The application and the attached narrative fail to provide evidence that the disposable household income or projected spending patterns of future residents will not drive additional employment, and therefore not lead to the need for affordable housing. For additional reference, Sec 27-151 of the DRMC explains the legislative findings and intent of the linkage fee.

The DRMC and associated Rules and Regulations set out that all structures built after June 30, 2022 shall offset their impact on affordable housing either monetarily or by providing deed restricted affordable housing. If you would like to explore options to income restrict a unit on-site, HOST staff would be happy to discuss this option, however, the financial impact to the project is likely to be greater than the linkage fee.

**Based on the evidence provided, the application does not meet the waiver criteria in the Denver Revised Municipal Code and HOST is unable to grant a waiver or reduction of the Linkage Fee.**

Thank you,

Laia Mitchell, HOST Director of Catalytic Partnerships



| | Department of Housing Stability |
|---|---|
| | **REDUCTION OR WAIVER REQUEST** |
| | From The Affordable Housing Linkage Fee |
| | Page 1 of 2 |

The Affordable Housing Permanent Funds Ordinance ("Ordinance") codified at Article V, Chapter 27 of the Denver Revised Municipal Code ("DRMC") requires the payment of a linkage fee for all new non-residential or residential development up to nine units. The Executive Director ("Director") of the Department of Housing Stability ("HOST") may reduce or waive the amount of the linkage fees that would otherwise be imposed. **Any applicant requesting such reduction or waiver must demonstrate that the required fee exceeds the amount needed to mitigate the actual demand for affordable housing created by the development.** The application for such reduction or waiver must include information showing the reduced affordable housing impacts created by the development, based on the actual characteristics of the development including, for example:

1) The unique characteristics and space utilization of the workforce that will occupy a non-residential development and the demand of that particular workforce for affordable housing;

2) A non-residential development that will involve a structure built for and suitable solely for a specific use involving few or no employees; or

3) The unique characteristics of the residents who will occupy a residential development and the likelihood those particular residents, due to their disposable household income or projected spending patterns, will not drive additional employment requiring additional affordable housing.

If you feel any of the above apply to your project, please complete this form and return to HOST along with the supporting documentation for review.

| I. CONTACT INFORMATION FOR APPLICANT/OWNER | |
|---|---|
| Name(s): Benjamin Walker | Phone Number: 3039974001 |
| Email(s): benw@redthomes.com | |
| Applicant/Owner Business Address:<br>4260 E Evans Ave, Denver CO 80222 | Applicant/Owner Business Name (if applicable): |

| II. PROJECT INFORMATION | |
|---|---|
| Project Name: 2140 & 2144 S Sherman St | Project Record Number(s) and Type:<br>2024-LOG-0012965 & 2024-LOG-0012975 |
| Project Address:<br>Denver CO 80210 | *Indicate record number type (e.g., Project Master, Concept, Zoning)* |
| *City staff to fill out market area information* | |
| **Applicable Market Area**<br>■ Typical Market Area   ☐ High Market Area | Date of Market Area Determination: 2024 |

| III. PROJECT DESCRIPTION |
|---|
| Two ying-yang duplexes, 3 stories with roof decks. Front facing unit has a detached 2-car garage and rear unit has a detached 1-car garage. LEED Gold home. Home to be priced at $800,000 where average comparisons are $850,000.<br><br>*Attach additional documentation if needed* |



FOR INFORMATION & CITY SERVICES   [www.denvergov.org/affordablehousingfee](www.denvergov.org/affordablehousingfee)   *September 21, 2022*

*Department of Housing Stability*
*201 W. Colfax Avenue #615*
*Denver, CO 80202*
*p: 720.913.1999*



**Department of Housing Stability**
**REDUCTION OR**
**WAIVER REQUEST**
From The Affordable Housing Linkage Fee

Page 2 of 2

| IV. REDUCTION OR WAIVER REQUEST |
|---|

Applicant/Owner Seeking:

☐ Reduction to the linkage fee        $ _____ Requested linkage fee reduction amount

Or

■ Full waiver of the linkage fee      $ 44,917.6 Requested linkage fee waiver amount

| V. EXCEPTION REQUEST |
|---|

Description of the request for a reduction to, or waiver of the linkage fee, including a justification for how the required fee exceeds the amount needed to mitigate the actual demand for affordable housing created by the development:

As a developer we understand the need for affordable housing in our city. However, after review of the fee's on this project, we believe there are grounds waiving of the fee. The linkage fee, for the project located in this neighborhood where there is a significant need for new houses imposes a financial restraint on these projects.

In addition to the linkage fee, the current market conditions make it challenging to absorb this fee without undermining the overall goals of attainability and project viability.

The proposed linkage fee may inadvertently hinder the development of housing in areas where affordable housing is most needed. This will have a negative impact on the community that we are trying to enhance in these locations through the provision of much needed housing.

*Provide any additional documentation in support of the request for a waiver or reduction.*

| VI. APPLICANT APPROVAL |
|---|

I, the undersigned, being the Applicant, or a duly authorized agent of the Applicant, hereby certify that the information provided above, to my actual knowledge, is true and correct.

Benjamin Walker                  *Benjamin Walker*                February 19th 2025
*Print Name*                          *Signature*                          *Date*

| VII. HOST DECISION |
|---|

The requested **reduction** of $_____ has been: ☐ approved ☐ denied

The requested **waiver** of $ 44,917.6 has been: ☐ approved ■ denied

Comments:

Has not demonstrated that the required Linkage Fee is greater than the amount of fee needed to mitigate the actual demand for affordable housing created by the development.

Adam Lyons                  Adam Lyons  Digitally signed by Adam Lyons
Date: 2025.03.14 17:10:10 -06'00'        3/13/25
*Department of Housing Stability*           *Signature*                          *Date*



**311** | **FOR INFORMATION &**
**CITY SERVICES**

www.denvergov.org/affordablehousingfee        *September 21, 2022*

*Department of Housing Stability*
*201 W. Colfax Avenue #615*
*Denver, CO  80202*
*p: 720.913.1999*

# EXHIBIT E

City and County of Denver Dept of Housing Stability

Response to Waiver of Linkage Fee Request

3/13/2025

LOG numbers: 2024-LOG-0010504, 2024-LOG-0010532, 2024-LOG-0010533, 2024-LOG-0010534
Location: 1245, 1251, 1255, 1261 W Gill Place
Applicant – Benjamin Walker – Sr. Architectural Project Manager – redT Homes

Dear Benjamin Walker,

We have reviewed your waiver request for 1245, 1251, 1255, 1261 W. Gill Pl. and determined that the project does not qualify for a linkage fee waiver. The linkage fee is based on the nexus between new development and the need for affordable housing in the city. To receive a reduction or waiver of the linkage fee, the applicant must demonstrate that the required linkage fee is greater than the amount of fee needed to mitigate the actual demand for affordable housing created by the development. The application and the attached narrative fail to provide evidence that the disposable household income or projected spending patterns of future residents will not drive additional employment, and therefore not lead to the need for affordable housing. For additional reference, Sec 27-151 of the DRMC explains the legislative findings and intent of the linkage fee.

The DRMC and associated Rules and Regulations set out that all structures built after June 30, 2022 shall offset their impact on affordable housing either monetarily or by providing deed restricted affordable housing. If you would like to explore options to income restrict a unit on-site, HOST staff would be happy to discuss this option, however, the financial impact to the project is likely to be greater than the linkage fee.

**Based on the evidence provided, the application does not meet the waiver criteria in the Denver Revised Municipal Code and HOST is unable to grant a waiver of the Linkage Fee.**

Thank you,

Laia Mitchell, HOST Director of Catalytic Partnerships



**Department of Housing Stability**
## REDUCTION OR
## WAIVER REQUEST
From The Affordable Housing Linkage Fee

Page 1 of 2

The Affordable Housing Permanent Funds Ordinance ("Ordinance") codified at Article V, Chapter 27 of the Denver Revised Municipal Code ("DRMC") requires the payment of a linkage fee for all new non-residential or residential development up to nine units. The Executive Director ("Director") of the Department of Housing Stability ("HOST") may reduce or waive the amount of the linkage fees that would otherwise be imposed. **Any applicant requesting such reduction or waiver must demonstrate that the required fee exceeds the amount needed to mitigate the actual demand for affordable housing created by the development.** The application for such reduction or waiver must include information showing the reduced affordable housing impacts created by the development, based on the actual characteristics of the development including, for example:

1) The unique characteristics and space utilization of the workforce that will occupy a non-residential development and the demand of that particular workforce for affordable housing;

2) A non-residential development that will involve a structure built for and suitable solely for a specific use involving few or no employees; or

3) The unique characteristics of the residents who will occupy a residential development and the likelihood those particular residents, due to their disposable household income or projected spending patterns, will not drive additional employment requiring additional affordable housing.

If you feel any of the above apply to your project, please complete this form and return to HOST along with the supporting documentation for review.

### I. CONTACT INFORMATION FOR APPLICANT/OWNER

| | |
|---|---|
| Name(s): **Benjamin Walker** | Phone Number: **3039974001** |
| Email(s): **benw@redthomes.com** | |
| Applicant/Owner Business Address:<br>4260 E Evans Ave, Denver CO 80222 | Applicant/Owner Business Name (if applicable): |

### II. PROJECT INFORMATION

| | |
|---|---|
| Project Name: **1245, 1251, 1255, 1261 W. Gill Pl** | Project Record Number(s) and Type: |
| Project Address:<br>Denver CO 80223 | *Indicate record number type (e.g., Project Master, Concept, Zoning)* |
| *City staff to fill out market area information* | |
| **Applicable Market Area**<br>■ Typical Market Area     ☐ High Market Area | Date of Market Area Determination: **2024** |

### III. PROJECT DESCRIPTION

Four single family residences with detached garages, 1592 SFR. 3 bed homes. LEED Gold home. Home to be priced at $600,000 in a neighborhood where there have been no new built detached homes in the past 13 years.

*Attach additional documentation if needed*


**FOR INFORMATION &**
**CITY SERVICES**



**Department of Housing Stability**
**REDUCTION OR**
**WAIVER REQUEST**
From The Affordable Housing Linkage Fee

Page 2 of 2

## IV. REDUCTION OR WAIVER REQUEST

Applicant/Owner Seeking:

☐ Reduction to the linkage fee          $ _____ Requested linkage fee reduction amount

Or

■ Full waiver of the linkage fee        $ 24,962.56 _____ Requested linkage fee waiver amount

## V. EXCEPTION REQUEST

Description of the request for a reduction to, or waiver of the linkage fee, including a justification for how the required fee exceeds the amount needed to mitigate the actual demand for affordable housing created by the development:

As a developer we understand the need for affordable housing in our city. However, after review of the fee's on this project, we believe there are grounds waiving of the fee. The linkage fee, for the project located in this neighborhood where there is a significant need for new houses (no new ones of this type since 2012) imposes a financial restraint on these projects.

In addition to the linkage fee, the current market conditions make it challenging to absorb this fee without undermining the overall goals of attainability and project viability.

The proposed linkage fee may inadvertently hinder the development of housing in areas where affordable housing is most needed. This will have a negative impact on the community that we are trying to enhance in these locations through the provision of much needed housing.

*Provide any additional documentation in support of the request for a waiver or reduction.*

## VI. APPLICANT APPROVAL

I, the undersigned, being the Applicant, or a duly authorized agent of the Applicant, hereby certify that the information provided above, to my actual knowledge, is true and correct.

| Benjamin Walker | *Benjamin Walker* | February 19th 2025 |
|---|---|---|
| *Print Name* | *Signature* | *Date* |

## VII. HOST DECISION

The requested **reduction** of $_____ has been: ☐ approved ☐ denied

The requested **waiver** of $ 24,962.56 has been: ☐ approved ■ denied

Comments:

Has not demonstrated that the required Linkage Fee is greater than the amount of fee needed to mitigate the actual demand for affordable housing created by the development.

| Adam Lyons | Adam Lyons  Digitally signed by Adam Lyons Date: 2025.03.14 17:10:55 -06'00' | 3/13/25 |
|---|---|---|
| *Department of Housing Stability* | *Signature* | *Date* |



FOR INFORMATION &
CITY SERVICES

www.denvergov.org/affordablehousingfee

*September 21, 2022*

*Department of Housing Stability*
*201 W. Colfax Avenue #615*
*Denver, CO 80202*
*p: 720.913.1999*