IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| redT HOMES, LLC and redT CAPITAL PARTNERS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> CITY AND COUNTY OF DENVER, <br><br> Defendant. | CIVIL ACTION NO.: <br> 1:25-CV-01681-PAB-TBO |

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

**INTRODUCTION**

Defendant's (the City's) motion to dismiss rests on a number of faulty premises. Its arguments as to subject-matter jurisdiction fail to acknowledge that an unconstitutional condition on a land-use permit creates a cognizable injury the moment it is demanded. Its arguments as to the validity of the Plaintiffs' (redT's) claims misunderstand that a land-use permit exaction must satisfy *both* the essential nexus *and* rough proportionality tests in order to survive constitutional scrutiny. Thus, the City's argument that redT failed to allege a lack of rough proportionality would not alone defeat redT's Complaint even if it were true—which it is not—because the City does not argue that redT's Complaint fails to allege a lack of nexus. Finally, the City's argument that the Mandatory Affordable Housing (MAH) Ordinance is exempt from scrutiny under *Nollan* and *Dolan* rests on outdated case

1

law and fails to appreciate the landscape of property rights protections under Colorado Law.

## LEGAL STANDARDS

### I.     Fed. R. Civ. P. 12(b)(1)

A motion to dismiss for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1) may take the form of either a facial attack or a factual challenge. *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004). A facial attack challenges "the complaint's allegations as to the existence of subject matter jurisdiction," while a facial attack challenges "the factual basis upon which subject matter jurisdiction rests." *Id.* A facial attack questions the Complaint's sufficiency and requires the court to accept the allegations as true, while a court reviewing a factual challenge does not presume the truthfulness of factual allegations in the Complaint. *Equal Emp. Opportunity Comm'n v. 'Murica, LLC*, 694 F. Supp. 3d 1356, 1361 (D. Colo. 2023). In either case, the party invoking jurisdiction bears the burden of establishing it. *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).

### II.    Fed. R. Civ. P. 12(b)(6)

On a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the Court must assume the truth of Plaintiffs' well-pleaded factual allegations and must view the facts in the light most favorable to the Plaintiffs. *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017). The Court then determines

2

whether the facts state a facially plausible claim to relief, meaning that the pleadings allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted).

## ARGUMENT

### I. Plaintiffs Have Standing to Bring this Suit

The City moves to dismiss for lack of subject-matter jurisdiction, arguing that Plaintiffs injuries are "only conjectural and hypothetical." (Mot. to Dismiss 5). It further argues that the Plaintiffs lack standing with respect to the South Sherman project because they are not title owners of those properties. Both arguments are without merit.

#### A. Unconstitutional Conditions Present Cognizable Injuries the Moment They Are Imposed

Under the doctrine of unconstitutional conditions, "[e]xtortionate demands for property . . . run afoul of the Takings Clause[.]" *Koontz v. St. Johns River Wtr. Mgmt. Dist.*, 570 U.S. 595, 607 (2013). This is true. It does not matter whether or not "the government ultimately succeeds in pressuring someone into forfeiting a constitutional right," and neither "does it make a difference . . . that the government might have been able to deny petitioner's application outright" without the offending condition. *Id.* at 606–08. Moreover, to ensure that plaintiff has suffered an actual injury rather than a hypothetical one, "nothing more than *de facto* finality is necessary." *Pakdel v. City and County of San Francisco*, 594 U.S. 474, 479 (2021). This "relatively modest" requirement requires only a demonstration that "there is no

3

question about how the regulations at issue apply to the particular land in question." *Id.* at 478 (quotation modified).

The government's position in this case—that it will not issue the subject permits unless and until redT complies with either the Linkage Fee Ordinance or the Mandatory Housing Ordinance—is sufficiently certain. Denver's Code states that, with exceptions not applicable here, "an affordable housing linkage fee *shall be imposed* prior to the issuance of a building permit for any new structure[.]" DRMC § 27-153(a) (emphasis added). While the Linkage Fee Ordinance provides for the possibility of a waiver or reduction, redT applied for such waivers and the government denied them. (Compl. ¶ 49). Thus, there is no question about how the Ordinance applies to redT's projects.

Crucially, the finality requirement for takings and unconstitutional conditions claims does not require a plaintiff to exhaust administrative remedies. *Pakdel*, 594 U.S. at 479. This case is brought under 42 U.S.C. § 1983 (Compl. ¶ 56), where "the settled rule is that exhaustion of state remedies is *not* a prerequisite[.]" *Knick v. Township of Scott*, 588 U.S. 180, 185 (2019) (quotation modified). Thus, while an exhaustion requirement might refer to "procedures by which an injured party may seek review of an adverse decision," the finality requirement at issue here is concerned only "with whether the *initial decisionmaker* has arrived at a definitive position on the issue[.]" *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*

4

*of Johnson City*, 473 U.S. 172, 193 (1985), *overturned in nonrelevant part by Knick*, 588 U.S. at 185) (emphasis added).

Neither does it matter whether, as the government asserts, redT might eventually abandon the projects or face permit denials for some unrelated reason. (Mot. to Dismiss 5–6). In an unconstitutional conditions case, it is the "extortionate demand[]" itself that "run[s] afoul of the Takings Clause" and which is prohibited. *Koontz*, 570 U.S. at 605, 607; *see also Martin v. United States*, 894 F.3d 1356, 1364 (Fed. Cir. 2018); *cf. N.E. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jackson*, 508 U.S. 656, 666 (1993) ("When the government erects a barrier [which violates equal protection,] a member of the [burdened] group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing."). So, too, is redressability easily established regardless of whether plaintiff may need to overcome additional hurdles to obtain a benefit. *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 285 (4th Cir. 2018) ("The removal of even one obstacle to the exercise of one's rights, even if other barriers remain, is sufficient to show redressability.").

### B. redT Is Injured with Respect to the South Sherman Project Regardless of Ownership

The government argues that Plaintiffs have no standing to challenge exactions imposed on the South Sherman street projects since neither redT Homes nor redT

Capital Partners owns the underlying properties.[1] (Mot. to Dismiss 6). But this argument fails under its own terms.

As the government explains, "the applicant for a building permit is responsible for paying affordable housing linkage fees." (*Id.*). Moreover, Denver's building code provides that "the owner of property *or the owner's agent* shall apply for building permits." (*Id.* (emphasis added)). In other words, a party acting as the owner's agent may serve as the applicant for a building permit, in which case that party is responsible for paying the fees. Here, the Complaint alleges—and the government does not dispute—that redT homes "is seeking development approval" for the South Sherman project, and that "redT Homes is the party responsible for actually paying the fee associated" therewith. (Compl. ¶¶ 42, 44). The obvious implication is that redT Homes is acting as the owner's agent and, therefore, as the applicant. *See Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1189 (10th Cir. 2000) (When reviewing a Rule 12(b)(1) dismissal for lack of standing, the court must draw "any reasonable inferences" from pleadings "in favor of Plaintiff[s]." (citation omitted)).

## II.   The Linkage Fee Ordinance Lacks a Nexus

The government argues that redT fails to state a claim with respect to the Linkage Fee Ordinance because the Complaint does not sufficiently allege a lack of

---

[1] To be clear, the government does not make this same argument with respect to the West Gill project, nor could it, since those properties are owned by Plaintiff redT Capital Partners. (Compl. ¶ 40).

6

proportionality. (Mot. to Dismiss 8) The argument is a nonstarter. Not only does it completely misunderstand the thrust of the Complaint, but it also fails to understand the conjunctive nature of the *Nollan* and *Dolan* tests.

First of all, as the government correctly states, an exaction violates the constitution if it *either* lacks a nexus with *or* is disproportionate to the impacts of the development. (Mot. to Dismiss 8). Put in the converse, the government must show that its exaction satisfies *both* the nexus *and* the proportionality tests in order to succeed. *See Dolan v. City of Tigard*, 512 U.S. 374, 391 (1994) (burden is on the government to "make some sort of individualized determination that the required dedication is related both in nature *and* extent to the impact of the proposed development") (emphasis added). Thus, the City's argument that "Plaintiffs fail to support any allegation that the Linkage Fee Ordinance is not roughly proportional" cannot alone support its motion to dismiss even if it were true. (Mot. to Dismiss 8). It is not true, of course, as redT plainly alleges, that the Linkage Fee Ordinance and the MAH Ordinance fail both elements of the *Nollan/Dolan* test. (Compl. ¶ 70).

Regardless, the City completely misses the thrust of redT's argument. The allegations in the Complaint do not "amount to an argument that the City should have determined the affordable housing linkage fees in the Nexus Study with a precise mathematical calculation[.]" (Mot. to Dismiss 9). Neither does the Complaint allege that the Nexus Study "is insufficient because it fails to account for a number of development situations." (Mot. to Dismiss 8). On the contrary, the argument

7

presented by the Complaint is that "new residential development *categorically* does not have a negative public impact on housing affordability," and therefore "there is *no* set of circumstances in which the Ordinances could satisfy *Nollan* and *Dolan*."[2] (Compl. ¶ 71) (emphasis added).

The nexus argument in this case is simple and straightforward. The development of new residential property simply does not and cannot have a negative public impact on housing affordability; an increase in supply lowers prices, it does not raise them. *See Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984) ("Market prices of commodities and most services are determined by supply and demand."). Contrary to the City's characterization, redT does not ask for more mathematical precision (Mot. to Dismiss 9), because no level of numerical exactitude can justify an exaction which categorically lacks a nexus. *Cf. WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1236 (10th Cir. 2017) (no amount of data could justify agency rationale which was "contrary to basic supply and demand principles.").

### III.   The MAH Ordinance Is Subject to *Nollan* and *Dolan*

The City's final argument is that the MAH Ordinance does not exact a property interest subject to *Nollan* and *Dolan*. The argument relies on misstatements of the law and outdated case authorities.

---

[2] Axiomatically, an exaction that fails nexus cannot possibly satisfy proportionality. Without a nexus, there is no pertinent impact to which the exaction can be proportional.

8

To begin, the City argues that nonmonetary exactions are subject to *Nollan* and *Dolan* only if they involve physical invasions of property. (Mot. to Dismiss 12). There is no such rule. Rather, the rule is that a land use permit condition is subject to the exactions doctrine if it would constitute a compensable taking if imposed outside of the permit context. *Koontz*, 570 U.S. at 612 ("A predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing."); *see Sheetz v. County of El Dorado*, 601 U.S. 267, 280–81 (2024) (The "threshold" question of *Nollan/Dolan* scrutiny is "whether the permit condition would be a compensable taking if imposed outside the permitting context.") (Sotomayor, J., concurring).

The City's cited authorities depend on outdated understandings of the doctrine, the logic of which is wholly abrogated by intervening precedent. Specifically, both the *Ramsey Winch* and *Alto Eldorado* cases rest on the now discredited notion that *only* permanent physical invasions of property can give rise to a *Nollan/Dolan* claim. *See Ramsey Winch Inc. v. Henry*, 555 F.3d 1199, 1208–09 (10th Cir. 2009); *Alto Eldorado P'ship v. Cnty. of Santa Fe*, 634 F.3d 1170, 1178 (10th Cir. 2011). Thus, for instance, the court in *Alto Eldorado* explicitly stated that a monetary fee could not support a *Nollan/Dolan* claim specifically because it did not constitute a physical per se taking. *Alto Eldorado*, 634 F.3d at 1178. But that logic was overruled the very next year by *Koontz*, which held plainly that monetary fees are subject to *Nollan* and *Dolan* where

9

they "operate upon . . . an identified property interest," thereby "burden[ing the plaintiff's] ownership of a specific parcel of land." *Koontz*, 570 U.S. at 613 (citation omitted).

*Koontz*'s reasoning refutes the City's characterization that the exactions doctrine "only applies to non-monetary exactions, when the condition would cause an owner to suffer a physical invasion of its property." (Mot. to Dismiss 12). For instance, *Koontz* likened monetary fees not to physical invasions, but to the taking of a lien, *i.e.*, "a right to receive money that is secured by a particular piece of property." *Koontz*, 570 U.S. at 613. The obvious implication is that a permit condition which demanded a lien on property would also implicate *Nollan* and *Dolan*, even though it does not involve any physical invasion of property, because of the "direct link between the government's demand and a specific parcel of real property." *Id.* at 614. That direct link raises the "central concern" of *Nollan and Dolan*: "that the government may use its substantial power and discretion in land-use permitting to pursue governmental ends that lack an essential nexus and rough proportionality to the effects of the proposed new use of the specific property at issue, thereby diminishing without justification the value of the property." *Id.*

Here, the MAH Ordinance directly limits the rate at which, and the class of people to whom, residential units may be leased or sold. This directly interferes with

10

property rights grounded in Colorado law.³ *See Phillips v. Washington Legal Found.*, 524 U.S. 156, 164 (1998) (existence of property interest protected by Takings Clause "is determined by reference to existing rules or understandings that stem from an independent source such as state law") (internal quotation omitted). Most obviously, it blatantly impairs the "well-recognized property right" in Colorado to "fix the price at which one will sell his property." *Olin Mathieson Chemical Corp. v. Francis*, 301 P.2d 139, 152 (Colo. 1956).

*Olin Mathieson* concerned the operation of the Colorado Fair Trade Act, which purported to allow manufacturers and wholesalers to fix the price at which retailers may sell their products, regardless of whether the retailers had agreed to such a restriction. 301 P.3d at 141. The state high court invalidated the statute on constitutional grounds. *Id.* at 152 ("Any act of the General Assembly which . . . permits the fixing of prices for the benefit of a special group [] is opposed to the constitutional concept of a free people and should not be allowed to stand."). The statute could not delegate price-fixing authority to manufacturers because the "General Assembly itself has no power to fix the prices of merchandise sold on the open market[.]" *Id.* at 145; *see id.* at 150 (the right of an owner to sell "its own property at a price agreeable to it is a right guaranteed by the Constitution since it is a valuable property right. That such right to sell is a valuable property right cannot be

---

³ Whatever else may be said about cases like *Alto Eldorado* and *Ramsey Winch*, neither dealt with the question of constitutionally protected property in Colorado.

11

denied.") (quoting *Union Carbide & Carbon Corp. v. White River Distributors, Inc.*, 275 S.W.2d 455, 457 (Ark. 1955)). The right to alienate property at one's chosen price in Colorado is just as strongly grounded today as it was when *Olin Mathieson* was decided, as evidenced by the statewide prohibition on rent control ordinances. Colo. Stat. Rev. Ann. § 38-12-301(1) ("[N]o county or municipality may enact any ordinance or resolution that would control rent on either private residential property or a private residential housing unit."). Indeed, Colorado statute specifically prohibits the "den[ial of] an application for a development permit . . . because an applicant for such a permit declines to enter into an agreement to limit rent[.]" *Id.* § 38-12-301(4). And in Colorado, courts look to statutory language to determine the existence of a constitutionally protected property right. *School Dist. No. 1 in City and County of Denver v. Masters*, 413 P.3d 723, 730 (Colo. 2018).

That the right to sell or lease at a price of one's choice is well-recognized in Colorado law clearly establishes its constitutional protection, and therefore its implication of *Nollan/Dolan* when impaired by permit condition. But even were this not the case, consider again *Koontz*'s logic. There the Court pointed out that a rule exempting monetary fees from scrutiny would create an enormous loophole by allowing the permitting authority to "simply give the owner a choice of either surrendering [a property interest] or making a payment equal to the [interest's] value." *Koontz*, 570 U.S. at 612. The MAH operates exactly the same way. The government clearly cannot constitutionally demand a monetary fee from permit

12

applicants and then distribute those funds to lower-income families to subsidize rent payments. How then could such a policy be saved by an alternative which requires permit applicants to transmit that subsidy directly by restricting the rates they may charge? That is just the type of technical end-run around the unconstitutional conditions doctrine that *Koontz* disparaged.

Even beyond the right to set one's own prices, the MAH quite literally takes a property interest in the form of demanding a restrictive covenant for a term of 99 years. (Compl. ¶¶ 29–30). A restrictive covenant is a property interest protected by the Constitution. *Cortese v. United States*, 782 F.2d 845, 850 (9th Cir. 1986); *see restrictive covenant*, Black's Law Dictionary (12th ed. 2024) (noting that a restrictive covenant is also termed an equitable easement or an equitable servitude); Restatement (Third) of Property, Servitudes, § 1.1(1) ("A servitude is a legal device that creates a right or an obligation that runs with land or an interest in land."); *but see Forest View Co. v. Town of Monument*, 464 P.3d 774, 781 (Colo. 2020)[4] (neighbors' rights to enforce restrictive covenant on government-acquired land not compensable). It is certainly more than a mere regulation on the use of land, which may evaporate with the winds of political change. Here the democratic process provides no remedy:

---

[4] In *Forest View*, the court held that neighbors who were not entitled to compensation for the government's violation of restrictive covenants on property it acquired. 464 P.3d at 776, 781. The government's impairment of an existing right between private parties is a much different situation than the government's taking of a new, valuable right for itself—here, the right to restrict the ability of redT (and its successors) to alienate its property at a contracted-for price.

13

Even if the MAH is later rescinded, redT and all subsequent owners of the property will still be subject to its strictures for 99 years.

The City's cited authorities cannot overcome this analysis. *Ramsey Winch* did not even involve a land-use permit condition at all; it was a challenge to a general Oklahoma statute that applied to all property owners, not permit-applicants in particular. *Ramsey Winch*, 555 F.3d at 1202, 1209. The *Alto Eldorado* case, meanwhile, rests on at least three propositions of law which have been repudiated by subsequent Supreme Court jurisprudence. First, its ultimate holding was that the takings challenge was unripe under the second prong of *Williamson County*, which required property owner to exhaust state remedies before bringing federal claims for just compensation. *Alto Eldorado*, 634 F.3d at 1174; *see Williamson County*, 473 U.S. at 195. But *Williamson County*'s second prong has since been overruled and is no longer good law. *Knick v. Township of Scott*, 588 U.S. 180, 206 (2019). Second, *Alto Eldorado* states that *only* permanent physical invasions can give rise to a *Nollan/Dolan* claim. *Alto Eldorado*, 634 F.3d at 1178. That conclusion clearly does not survive *Koontz*. And third, the case suggests that physical invasions must be "permanent" to constitute *per se* takings. *Id.*; *see also id.* at 1178 n.4. But the Supreme Court later clarified that physical invasions result in *per se* takings even if temporary. *Cedar Point Nursery*, 594 U.S. at 153.

In short, the government's demand of a restrictive covenant that impairs the right to sell or lease property at one's chosen price would undoubtedly constitute a

14

taking if done outside the permitting context. A permit condition requiring the same is therefore subject to *Nollan* and *Dolan*.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this Court DENY the Defendant's motion to dismiss.

DATED: September 15, 2025.

                                         Respectfully submitted,

                                         */s/ David J. Deerson*
                                         DAVID J. DEERSON
                                         CA Bar No. 322947
                                         AUSTIN W. WAISANEN*
                                         WY Bar No. 8-7023
                                         Pacific Legal Foundation
                                         3100 Clarendon Blvd., Suite 1000
                                         Arlington, VA 22201
                                         (202) 888-6881
                                         AWaisanen@pacificlegal.org
                                         DDeerson@pacificlegal.org
                                         **admitted only in the State of Wyoming*

                                         *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which sent notification of such filing to all counsel of record:

*/s/ David J. Deerson*
DAVID J. DEERSON
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
(202) 888-6881
DDeerson@pacificlegal.org

*Counsel for Plaintiffs*