IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 25-cv-01681-PAB-TPO

redT HOMES, LLC, and
redT CAPITAL PARTNERS, LLC,

 Plaintiffs,

v.

CITY AND COUNTY OF DENVER,

 Defendant.

---

## ORDER

---

 This matter comes before the Court on Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief [Docket No. 14]. Defendant City and County of Denver ("Denver") seeks to dismiss, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), plaintiffs' sole claim, a Takings Clause claim brought under 42 U.S.C. § 1983. Docket No. 14 at 1. Plaintiffs redT Homes, LLC ("redT Homes") and redT Capital Partners, LLC ("redT Capital") filed a response. Docket No. 19. Denver filed a reply. Docket No. 20. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I. BACKGROUND[1]

Plaintiff redT Homes is a Denver homebuilder.  Docket No. 11 at 1, ¶ 1.  Its sister

company, redT Capital, owns properties which redT Homes develops.  *Id.*  Plaintiffs

challenge Denver's Dedicated Fund for Affordable Housing Ordinance ("Linkage Fee

Ordinance"), Denver Rev. Muni. Code (DRMC) Ch. 27, art. V, and its Mandatory

Affordable Housing Ordinance, DRMC Ch. 27, art. X.  *Id.* at 2-3, ¶ 4.  Plaintiffs allege

that these two ordinances constitute unconstitutional conditions in violation of the

Takings Clause of the Fifth Amendment of the U.S. Constitution.  *Id.*

### A.  The Ordinances and Their Impact on redT Projects

#### 1.  Linkage Fee Ordinance

The Linkage Fee Ordinance requires building permit applicants to pay affordable

housing linkage fees as part of new residential and nonresidential construction in

Denver in order to fund affordable housing.  *Id.* at 4-5, ¶¶ 11, 13-14.  The Linkage Fee

Ordinance applies to residential developments of fewer than ten dwelling units.  *Id.* at 5,

¶ 13.

The Linkage Fee Ordinance is premised on legislative findings by Denver that

"[t]he extraordinary housing cost increases in Denver are driven, in part, by the pace of

population and job growth in the city, resulting in a situation where demand for housing

has far outpaced supply" and that "residential and non-residential development is

demonstrably associated with the generation of new jobs at various income levels, with

the number of jobs associated with any particular development being correlated with the

---

[1] The facts below are taken from plaintiffs' second amended complaint ("the
complaint"), Docket No. 11, and are presumed to be true, unless otherwise noted, for
purposes of ruling on defendant's motion to dismiss.

type and size of the development." *Id.* at 6, ¶¶ 17-18.  These legislative findings are

"supported by the 'Denver Affordable Housing Nexus Study.'" *Id.*, ¶ 19.  The Nexus

Study underlying the Linkage Fee Ordinance relies on the argument that new housing

development creates economic activity which results in an increased workforce in need

of housing.  *Id.*, ¶ 20.  The study begins by estimating the sale or rent price of a

"prototypical" residential unit and "moves through a series of linkages to the incomes of

the households that purchase or rent the units, the annual expenditures of those

households on goods and services, the jobs associated with the delivery of these goods

and services, the income of the workers performing those jobs, the household income of

those worker households, and finally to the affordability level of the housing needed by

those worker households." *Id.* at 7, ¶ 21.

 The linkage fees required for the issuance of a building permit currently range

from $1.99 to $7.22 per square foot of gross floor area.  *Id.* at 5, ¶ 14.

 Denver's Department of Housing Stability enforces the Linkage Fee Ordinance

requirements, and the head of the department may reduce or waive the amount of

linkage fees if an application demonstrates that the required amount of fees exceeds

the amount that would be needed to mitigate the actual demand for affordable housing

created by the development.  *Id.* at 5-6, ¶¶ 12, 16.  Instead of paying the linkage fee, an

applicant may instead choose to comply with the Mandatory Affordable Housing

Ordinance.  *Id.* at 7, ¶ 23.

 redT Homes is seeking development approval for the West Gill Single Family

project ("West Gill project") in Denver, which consists of four single-family residences of

three bedrooms.  *Id.* at 11-12, ¶ 40.  The West Gill property is owned by redT Capital.

*Id.*  The West Gill project will require payment of approximately $24,962.56 under the Linkage Fee Ordinance (at $3.92 per square foot of gross floor area).  *Id.* at 12, ¶ 41.

redT Homes is also seeking development approval for the South Sherman Duplex project ("South Sherman project") in Denver, which consists of two duplexes (for a total of four units).  *Id.*, ¶ 42.  redT Homes is the party responsible for actually paying the fees associated with the Linkage Fee Ordinance to Denver for the South Sherman project.  *Id.*, ¶ 44.  The South Sherman project will require payment of approximately $44,917.60 under the Linkage Fee Ordinance (at $6.17 per square foot of gross floor area).  *Id.*, ¶ 45.

On February 19, 2025, redT Homes applied for waivers from the Linkage Fee Ordinance in connection with both the South Sherman project and the West Gill project.  *Id.* at 13, ¶ 48.  The waiver requests stated, in part, that the "proposed linkage fee may inadvertently hinder the development of housing in areas where affordable housing is most needed.  This will have a negative impact on the community that we are trying to enhance in these locations through the provision of much needed housing."  *Id.*  On March 13, 2025, Denver denied the waiver requests.  *Id.*, ¶ 49.

### 2. *Mandatory Affordable Housing Ordinance*

The Mandatory Affordable Housing Ordinance is intended to promote the construction of new affordable housing units in the city.  *Id.* at 8, ¶ 25 (citing Docket No. 11-1 at 18-19) (Denver Revised Muni. Code § 27-218).  The Mandatory Affordable Housing Ordinance requires any development of ten or more dwelling units to provide a certain portion of those units as affordable units.  *Id.*  The Mandatory Affordable Housing Ordinance also gives an applicant the option to pay a fee in-lieu or negotiate an alternative to the base affordable unit requirement.  *Id.* at 9-10, ¶¶ 32-33.

4

The Mandatory Affordable Housing Ordinance is based on legislative findings that "[m]arket forces, including continued population growth and unmet demand for new housing, result in highly priced housing, and a lack of economic incentive for developers to offer a more diversified price range of housing, and therefore such housing is not being created at a level that meets current demand" and that "[r]apid regional growth and a strong housing demand have combined to make land and construction costs higher, limiting the areas where affordable housing is located." *Id.* at 10, ¶ 35.

For the calculation of the percentage of units that must be restricted based on income, developments are divided into "high market" and "typical market" categories. *Id.* at 8, ¶ 26. Two compliance options are available within each category, allowing developers to select the amount of units to be set aside and adjusting the level of price control accordingly. *Id.* For example, a "typical market" development may choose to set aside 10% of units to be rented to persons earning 60% of the area median income or sold to people earning 80% of the area median income, or the developer may choose to set aside 15% of units to be rented to persons earning an average of 70% of the area median income or sold to persons earning an average of an average of 90% of the area median income. *Id.*

If the formula for determining the number of income-restricted units required results in a fractional unit, the requirement is rounded up or down to the nearest whole unit, except that at least one unit must be provided. *Id*. 8-9, ¶ 27. For four-unit developments like the South Sherman and West Gill projects, one income-restricted unit would be required. *Id.*

5

Developments containing income-restricted units, or the income-restricted units themselves, must carry out deed restrictions, restrictive covenants, or other forms of affordability restrictions. *Id.* at 9, ¶ 29. The income-restricted units must be maintained at affordable rates for a minimum term of 99 years and must be occupied by an eligible household whose income is at or below the applicable income limit. *Id.*, ¶ 30.

Unlike the Linkage Fee Ordinance, the Mandatory Affordable Housing Ordinance does not permit waiver requests. *Id.* at 13, ¶ 51. However, an alternative to the requirement of income restricting a unit in the new development, the developer may pay a fee in-lieu. *Id.* at 9, ¶ 32. These fees are calculated differently from those in the Linkage Fee Ordinance and range from $250,000 to $478,000 for each of a certain percentage of units depending on the market area classification and the specific type of residential development at issue. *Id.* The Mandatory Affordable Housing Ordinance also provides that applicants may propose "negotiated alternative" compliance methods which may be accepted at the discretion of the executive director of the Department of Housing Stability. *Id.* at 9-10, ¶ 33. The applicant must "demonstrate how the proposed negotiated alternative provides outcomes that better support the goals of the [Department of Housing Stability] strategic plan, comprehensive plan goals, and any small area plan applicable to the residential development." *Id.* The Mandatory Affordable Housing Ordinance includes a non-exclusive list of contemplated negotiated alternatives, including the dedication of land, adjustment to the number, affordability-level, or features of income-restricted units, and the provision of off-site income-restricted units. *Id.* at 10, ¶ 34.

For the South Sherman and West Gill projects, the Mandatory Affordable Housing Ordinance in-lieu fees would be significantly higher than the Linkage Fee Ordinance fees.  *Id.* at 14, ¶ 52.

### B.  Alleged Deficiencies with the Ordinances

The complaint alleges that new residential development "categorically does not have a negative public impact on housing affordability."  *Id.* at 18, ¶ 71.  The complaint claims that the Nexus Study is insufficient to support the ordinances because 1) "[i]t fails to account for the downward pressure that new supply puts on pricing," 2) "[i]t fails to account for the 'filtering' effect of new housing supply, by which existing units are freed up by new units, and by which new units become more affordable over time," 3) "[i]t fails to establish the causal relationship between new residential development and increased workforce housing demands on which it relies," and 4) "[i]t cannot explain why new commercial and industrial development is sometimes subject to lower fees than new residential development, despite the fact that new commercial and industrial development is naturally more directly related to increased workforce housing demands."  *Id.* at 18-19, ¶ 72.

redT did not have, and Denver did not provide, any alternative to the conditions imposed by the ordinances.  *Id.* at 19, ¶ 73.

## II.  LEGAL STANDARD

### A.  Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a party to move to dismiss a claim for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  A dismissal under Rule 12(b)(1) is not a judgment on the merits; rather, it is a determination that the court lacks jurisdiction to adjudicate the claim.  *Creek Red Nation, LLC v. Jeffco Midget*

7

*Football Ass'n., Inc.*, 175 F. Supp. 3d 1290, 1293 (D. Colo. 2016). A court lacking jurisdiction "must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, 945 F.3d 1270, 1273 (10th Cir. 2019) (citation omitted). The dismissal is without prejudice. *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1218 (10th Cir. 2006).

Challenges to subject matter jurisdiction may take two forms – a facial attack or a factual attack – each with distinct analytical frameworks. *United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001). A facial challenge focuses on the sufficiency of the allegations in the complaint. *Id.* In resolving a facial challenge, "the district court must accept the allegations in the complaint as true." *Id.* By contrast, a factual challenge allows a party to "go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends." *Id.* (citation omitted). In addressing a factual challenge to subject matter jurisdiction, "the court does not presume the truthfulness of the complaint's factual allegations." *Id.* (citation and quotations omitted); *see also Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001) ("a court's reference to evidence outside the pleadings does not convert the motion into a Rule 56 motion"). "A challenge to a plaintiff's standing to bring a particular claim is properly raised in a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction." *Creek Red Nation, LLC,* 175 F. Supp. 3d at 1293.

### B.  Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)).  A plausible claim is a claim that "allows the court

to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While the court must accept the

well-pled allegations of the complaint as true and construe them in the light most

favorable to the plaintiff, *Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002),

conclusory allegations are not entitled to be presumed true.  *Iqbal*, 556 U.S. at 681.

However, so long as the plaintiff offers sufficient factual allegations such that the right to

relief is raised above the speculative level, she has met the threshold pleading

standard.  *See, e.g.*, *Twombly*, 550 U.S. at 556; *Bryson v. Gonzales*, 534 F.3d 1282,

1286 (10th Cir. 2008).

## III.  ANALYSIS

Plaintiffs bring one claim, pursuant to 42 U.S.C. § 1983, alleging an

unconstitutional exaction in violation of their Fifth and Fourteenth Amendment rights.

Docket No. 11 at 14-19.  Plaintiffs describe their claim as both a facial and an as-

applied challenge to the ordinances.  *Id.* at 18, ¶ 70.  Denver seeks to dismiss the

complaint under Rule 12(b)(1), arguing that plaintiffs lack standing, and under Rule

12(b)(6), arguing that plaintiffs have failed to state a claim upon which relief can be

granted.  Docket No. 14 at 1-2.

### A.  <u>Motion to Dismiss for Lack of Standing</u>

To establish Article III standing, a plaintiff must allege "that (1) he or she has

suffered an injury in fact; (2) there is a causal connection between the injury and the

conduct complained of; and (3) it is likely that the injury will be redressed by a favorable

decision."  *Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003) (quoting *Phelps v.

Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997)).  In order to show the first element of

standing, a plaintiff must show she has "suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations and citations omitted); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) ("Injury in fact is a constitutional requirement."). An injury is particularized if it affects the plaintiff in "a personal and individual way." *Spokeo,* 578 U.S. at 339 (citation omitted). "A 'concrete' injury must be 'de facto'; that is, it must actually exist;" it must be "real," not "abstract." *Id*. at 340. Furthermore, "[a] federal court's jurisdiction . . . can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury.'" *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 (1973)).

Denver makes two arguments as to why plaintiffs have not alleged an injury in fact. Docket No. 14 at 4-6. For the first injury-related argument, Denver notes that, since the building permits are still under review and various city agencies may still impose other burdens on the projects, it is possible that 1) plaintiffs will decide to abandon the projects or that 2) Denver will deny the permits for another reason. *Id.* For the first part of this argument, which the Court understands to be an argument that the injury to plaintiffs is too hypothetical because plaintiffs might abandon the project, the Court notes that plaintiffs have alleged that they applied for permits, sought a waiver of the Linkage Fee Ordinance, and Denver denied the waiver. Docket No. 11 at 13, ¶¶ 48-49. Plaintiffs thus allege that they were impermissibly denied a government benefit, and "the impermissible denial of a governmental benefit is a constitutionally cognizable injury." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 607 (2013); *see*

*also Palmer Kearney Mesa Props., LP v. City of San Diego*, 2026 WL 125686, at *6-7

(S.D. Cal. Jan. 16, 2026) (discussing a city's ripeness argument regarding a developer's

permit application).  For the second part of the argument, the fact that Denver may deny

the permits for other reasons does not mean that plaintiffs did not suffer an injury.  *See*

*Koontz,* 570 U.S. 595 at 607 ("Nor does it make a difference, as respondent suggests,

that the government might have been able to deny petitioner's application outright

without [requiring an exaction].").  Therefore, the Court rejects the first injury-related

argument.

For the second injury-related argument, Denver argues that plaintiffs have not

suffered an injury because they no longer own the South Sherman project property.

Docket No. 14 at 6 (citing Docket No. 11 at 12, ¶ 43).  Yet, Denver itself notes that, the

city building code provides that either the property owner or the property owner's agent

shall apply for building permits, and that the person applying for the permit shall be

responsible for paying the linkage fees.  Docket No. 14 at 6 (citing Denver Revised

Muni. Code § 27-156).  Plaintiffs allege that, despite having sold the property, they are

still the ones responsible for paying the fees.  Docket No. 11 at 12, ¶ 44.  The inference

is that plaintiffs are the owner's agent for the South Sherman project property and are

paying the linkage fees as the agent.  Plaintiffs have thus sufficiently alleged an injury

for standing purposes.  Moreover, even if plaintiffs did not have standing to challenge

the ordinances due to not owning the South Sherman project property, plaintiffs still own

the West Gill project property and thus have standing based on that ownership to

challenge the constitutionality of the ordinances.

The Court finds that Denver's argument regarding plaintiffs' standing fails.[2]

### B. <u>Motion to Dismiss for Failure to State a Claim</u>

Denver argues that neither the Linkage Fee Ordinance or Mandatory Affordable Housing Ordinance constitutes an unconstitutional condition on plaintiffs' property rights. Docket No. 14 at 7-15.

The Takings Clause of the Fifth Amendment states that private property shall not "be taken for public use, without just compensation." U.S. Const. amend V. The Takings Clause applies to federal governmental entities and, through the Fourteenth Amendment, to state and local governmental entities as well. *Chicago, B. & Q. R. Co v. City of Chicago*, 166 U.S. 226, 239-241 (1897). The prohibition against taking private property without just compensation has been extended to situations where a government conditions the approval of a development project on the applicant dedicating a property interest to the governmental body or public at large – what is known as "exactions." *See Dolan v. City of Tigard*, 512 U.S. 374, 384-85 (1994); *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 837 (1987). "Extortionate demands for property in the land-use permitting context run afoul of the Takings Clause not because they take property but because they impermissibly burden the right not to have property taken without just compensation." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 607 (2013). The Supreme Court has held that these sorts of "exactions" also occur when the government requires citizens to expend money in exchange for development or permitting approval. *Id.* at 619.

---

[2] Plaintiffs believe that Denver is also making a ripeness challenge due to plaintiffs' alleged failure to exhaust administrative remedies. Docket No. 19 at 3-5. The Court does not understand Denver to make this argument and therefore does not reach this issue.

*Nollan*, *Dolan*, and *Koontz* are the guideposts for the Court's analysis.  In *Nollan*, the Supreme Court determined that when a government entity demands the conveyance of property in exchange a permit, the "just compensation" requirement of the Takings Clause was potentially implicated.  483 U.S. at 834-38, 841-42.  There, the landowners applied for a permit from the California Coastal Commission (the "Commission") to demolish their current beachfront home and build a larger one.  *Id.* at 828.  The Commission was willing to approve the permit on the condition that the landowners provided a public easement across their beachfront.  *Id.*  The Supreme Court noted that "[h]ad California simply required . . . an easement . . . available to the public on a permanent basis . . . there would have been a taking."  *Id.* at 831.  But, because the permit approval was essentially a land-use regulation, it would not effect a taking so long as the regulation advanced a legitimate state interest and did not deny the landowners economically viable use of the land.  *Id.* at 834.

The Commission offered several legitimate governmental interests, such as "protecting the public's ability to see the beach" and "preventing congestion" on public beaches.  *Id.* at 835.  However, the Supreme Court reasoned that none of these purposes, even if legitimate, had an "essential nexus" to the easement.  *Id.* at 836-37.  It was "quite impossible to understand how a requirement that people already on the public beaches be able to walk across the [landowners'] property reduces any obstacles to viewing the beach created by the new house."  *Id.* at 838.  The permit condition therefore violated the Takings Clause.  *Id.* at 841-42.

The Supreme Court elaborated on *Nollan* in *Dolan*, answering the question of whether all conditions with an essential nexus satisfy the strictures of the Takings

Clause.  In *Dolan*, a business owner wanted to expand her business and, to do so,
planned to redevelop her property by paving a parking lot and expanding her store.  512
U.S. at 379.  A portion of her property, however, was located in a 100-year flood plain.
*Id.*  The business owner applied for a permit to begin development; the city granted the
permit on the condition that she dedicate part of her land as a public greenway to assist
with storm drainage and another fifteen-foot strip as a pedestrian and bike path.  *Id.* at
380, 393.  The Supreme Court first looked to the essential nexus.  *Id.* at 387.  The Court
determined that such a nexus existed because there was a connection between
increased flooding that could result from development within the flood plain and the
requirement to offset such flooding with a greenway.  *Id.*  Additionally, the pedestrian
and bike path could theoretically reduce the increased congestion that may result from
the new, larger store.  *Id.* at 387-88.

However, the Supreme Court concluded that nexus was not enough.  There must
also be a "rough proportionality" between the condition and the effect of the
development.  *Id.* at 391 ("No precise mathematical calculation is required, but the city
must make some sort of individualized determination that the required dedication is
related both in nature and extent to the impact of the proposed development." (footnote
omitted)).  The Supreme Court did not fully answer whether the condition satisfied the
rough proportionality requirement.  *Id.* at 393-96.  However, it did note that the city had
failed to demonstrate that a public, instead of a private, greenway was roughly
proportional to the effect on development, or that the path would actually, rather than
potentially, offset congestion.  *Id.*

Finally, in *Koontz*, the Supreme Court extended the essential nexus and rough proportionality tests to situations in which a government does not demand that the landowner give the governmental entity a real property interest but, instead, demands that a permit seeker expend money to receive permit approval. 570 U.S. at 612-15. There, a landowner sought to develop 3.7 acres of a 14.9-acre tract of land that was predominantly classified as wetlands. *Id.* at 600. The landowner applied for a permit from the relevant water district, which said it would grant the permit on one of two conditions: the landowner either reduce the size of the proposed development to one acre and grant a conservation easement on the remaining 13.9 acres or build the development as proposed but also "hire contractors to make improvements to District-owned land several miles away." *Id.* at 602.

The Supreme Court rejected the argument that asking the landowner to "spend money rather than give up an easement on his land" rendered the takings claim incognizable. *Id.* at 611-13. Accepting such an argument, the *Koontz* court reasoned, would make it "very easy for land-use permitting officials to evade" *Nollan* and *Dolan* because officials "wishing to exact an easement could simply give the owner a choice of either surrendering an easement or making a payment equal to the easement's value." *Id.* at 612. Because such "in lieu of" fees are "functionally equivalent to other types of land use exactions" and because demands for money "operate upon . . . an identified property interest," the Supreme Court held that monetary exactions – defined as a

15

government demand for a citizen to expend money in exchange for development or permitting approval [3] – must also satisfy *Nollan* and *Dolan*.  *Id.* at 612-13.

Thus, *Nollan*, *Dolan*, and *Koontz* require that, when a governmental entity places a condition on an identifiable property interest, there must be an "essential nexus" between the condition and the development, as well as "rough proportionality" between the effect of the development and the condition.  *Id.*; *Dolan*, 512 U.S. at 386, 391.

### C. <u>Whether the Linkage Fee Ordinance is an Unconstitutional Condition</u>

Denver argues that plaintiffs' claim fails for not sufficiently alleging a lack of "rough proportionality."  Docket No. 14 at 8-11.  Denver views plaintiffs' complaint, which lists various ways in which plaintiffs believe the Linkage Fee Ordinance formula is deficient, as incorrectly asserting a right to a precise mathematical calculation.  *Id.* at 8-9.  Denver notes that the Nexus Study recommended higher Linkage Fee Ordinance fee rates, and that Denver decided not to charge the "maximum legally justifiable fee."  *Id.* at 9.  Denver also argues that the fact that Linkage Fee Ordinance provides for individualized consideration of waiver requests demonstrates that there is "rough proportionality."  *Id.* at 10-11.  Finally, Denver argues that, because the compliance with the Mandatory Affordable Housing Ordinance is an alternative to paying the linkage fee, and that the Mandatory Affordable Housing Ordinance is constitutionally permissible, the Linkage Fee Ordinance is also constitutional.  *Id.* at 14-15.

---

[3] In *Koontz*, the Supreme Court explained that a monetary exaction is not the same as a tax.  *Id.* at 615-17.  The Court noted that "teasing out the difference between taxes and takings is more difficult in theory than in practice," and that it did not need to decide "at precisely what point a land-use permitting charge denominated by the government as a 'tax' becomes 'so arbitrary . . . that it was not the exertion of taxation but a confiscation of property."  *Id.* at 616-17 (citation omitted).

As a threshold matter, Denver does not argue that plaintiffs fail to plead a lack of "essential nexus" between a legitimate state interest and the permit condition. Because a finding of an unconstitutional condition can be based on either the lack of an essential nexus or on the lack of rough proportionality, *Dolan*, 512 U.S. at 386, plaintiffs' claim can survive even if it only alleges one of the two deficiencies. Although the complaint is not entirely clear, the Court understands its allegation that "new residential development categorically does not have a negative impact on housing affordability," Docket No. 11 at 18, ¶ 71, to assert both a lack of essential nexus and a lack of rough proportionality. Thus, plaintiffs' claim would survive even if Denver is correct about the failure to plead a lack of "rough proportionality."

The Court finds that Denver is not correct about the lack of allegations of "rough proportionality." The Supreme Court has explained that a precise mathematical calculation is not required in order for a permit condition to meet the "rough proportionality" requirement. In *Dolan*, the Supreme Court found a lack of "rough proportionality" based on the fact that the city permitting authority had found only that the imposed conditions "could" mitigate issues caused by the new development, rather than finding that the imposed conditions would or were likely to mitigate those problems. 512 U.S. at 395-96. The complaint here provides some details about how the linkage fee calculations work, *see* Docket No. 11 at 6-7, ¶¶ 20-21, but the Court cannot, from these details alone, determine whether Denver has made the requisite effort to quantify its findings in support of the imposed condition. Instead, a dispute regarding the sufficiency of Denver's calculations is better addressed at summary judgment. Similarly, Denver's arguments about choices it made in setting the linkage fees and

about the individualized determination and waiver process rely on facts not properly

before the Court at the motion to dismiss stage.

### D.  Whether the Mandatory Affordable Housing Ordinance is an Unconstitutional Condition

Denver makes two arguments as to why plaintiffs have failed to state a claim

regarding the constitutionality of the Mandatory Affordable Housing Ordinance.  Docket

No. 14 at 11-15.

First, Denver argues that the *Nollan* and *Dolan* tests apply only when the

government requires, as a condition of the permit, that the applicant permit the

government or the public to physically invade the applicant's property.  *Id.* at 12-14.

Because the Mandatory Affordable Housing Ordinance does not require a physical

invasion of plaintiffs' property, Denver argues that the *Nollan* and *Dolan* requirements

do not apply.  *Id.*  As plaintiffs note, however, Docket No. 19 at 9-11, the Supreme

Court's holding in *Koontz* forecloses this argument.  In *Koontz*, the Supreme Court held

that the unconstitutional conditions doctrine applied to both monetary and non-monetary

exactions, so long as there is a "direct link between the government's demand and a

specific parcel of real property."  570 U.S. at 614.

Denver's second argument is that affordable housing requirements such as the

Mandatory Affordable Housing Ordinance are not subject to *Nollan* and *Dolan*.  Docket

No. 14 at 14.  Plaintiffs respond that *Nollan* and *Dolan* apply because the Mandatory

Affordable Housing Ordinance "directly interferes with property rights grounded in

Colorado law."  Docket No. 19 at 10-11.  Plaintiffs argue that Colorado law recognizes

the right of a property owner to fix the sale price of its property and that a Colorado

statute prohibits the imposition of rent controls.  *Id.* at 12.  Plaintiffs also assert that the

Mandatory Affordable Housing Ordinance results in the government taking a property interest in the form of the 99-year restrictive covenant imposing the affordable housing conditions.  *Id.* at 13.  As a result, plaintiffs claim that the Mandatory Affordable Housing Ordinance is subject to *Nollan* and *Dolan* because it allows Denver to impose requirements that it could not otherwise impose.

"A predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing."  *Koontz*, 570 U.S. at 612.  *Koontz* explained that, "if the government had directly seized the easements it sought to obtain through the permitting process, it would have committed a per se taking."  *Id.*  The question here is whether Denver could have imposed the Mandatory Affordable Housing Ordinance, requiring the dedication of a certain percentage of units for sale or lease to individuals within a certain income threshold, without effecting a taking.

Regulatory actions can constitute takings and trigger the right to compensation in several ways.  First, a per se taking occurs when the government "physically appropriate[es] property or otherwise interfere[s] with the owner's right to exclude others from it."  *Sheetz v. Cnty. of El Dorado, Cal.*, 601 U.S. 267, 274 (2024) (quoting *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149–152 (2021)) (internal quotations omitted).  Second, a per se taking also occurs when the government "completely deprive[s] an owner of all economically beneficial use of her property."  *Green Room LLC v. Wyo.*, 157 F.4th 1196, 1211 (10th Cir. 2025) (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005) (emphasis omitted)).  The third form of a regulatory taking is governed by the standard set forth in *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104

(1978), and considers "(1) [t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations, and (2) the character of the governmental action."  *Green Room*, 157 F.4th at 1211 (quoting *Penn Cent. Transp.*, 438 U.S. at 124) (internal quotation omitted).

Plaintiffs' response to the motion to dismiss is not altogether clear as to which form of taking they believe the Mandatory Affordable Housing Ordinance constitutes. But they do not assert, either in the complaint or in the response brief, that the Mandatory Affordable Housing Ordinance has deprived them of all economically beneficial use of their property.  They also do not discuss factors relevant to the *Penn Central* analysis, such as what their expectations were at the time they made their investments.  As such, the only remaining theory upon which plaintiffs' claim could survive is if the Mandatory Affordable Housing Ordinance physically appropriates plaintiffs' property or interferes with their right to exclude others from it.  It is through this lens that the Court views plaintiffs' arguments regarding the 99-year deed restriction and regarding Colorado property law.

Several courts have addressed similar arguments regarding affordable housing ordinances that require the dedication of a certain percentage of units.  In *Palmer Kearney Mesa Props*, 2026 WL 125686, at *1, the court addressed a San Diego, California ordinance that "requires developers of certain new developments to set aside 10% of residential units for low-income households at a cost, including an allowance for utilities, that does not exceed 30 percent of 60 percent of median income."  (internal quotations and citation omitted).  The affordable units were to be restricted for at least

55 years by covenants recorded in the deeds.  *Id.*  The ordinance permitted developers, in lieu of dedicating income-restricted units, to pay fees to an affordable housing fund. *Id.*  The court held that the ordinance did not constitute a physical taking and that, rather than requiring the property owner to submit to occupation, the ordinance merely regulated the owner's use of its own property when it voluntarily chose to enter the rental market.  *Id.* at *8 (citing *Yee v. City of Escondido*, 503 U.S. 519, 527-28 (1992)). The court therefore found that the ordinance did not, on its own, constitute a taking, and that an unconstitutional conditions claim under *Nollan* and *Dolan* could not survive.  *Id.* at *9.

In *2910 Georgia Ave. LLC v. D.C.*, 234 F. Supp. 3d 281, 287 (D.D.C. 2017), the court addressed a District of Columbia law that required that "8–10 percent of the gross floor area of new residential developments (or substantial additions to existing developments) in the District be used for sale or lease to eligible low – and moderate-income households at certain maximum price levels."  The law stated that "no building permit shall be issued" unless the developer "records a covenant in the land records of the District of Columbia that binds all persons with a property interest in any or all of the [property] to construct and reserve the number of inclusionary units."  *Id.*  The court analyzed the law under the *Penn Central* framework and found that it did not constitute a regulatory taking.  *Id.* at 298-302.  The court also found that the plaintiff's claim could not survive under a theory of physical invasion or of loss of all economic value.  *Id.* at 302.  Finally, the court found the *Nollan* and *Dolan* framework inapplicable, in part because there had been no taking in the first place.  *Id.* at 304-06.

In *Home Builders Ass'n of Greater Chicago v. City of Chicago*, 213 F. Supp. 3d 1019, 1022 (N.D. Ill. 2016), the court addressed a Chicago, Illinois ordinance that applied to certain residential housing projects of more than ten units. The ordinance required that, for these projects, the developer "either (1) dedicate ten percent of the new units as affordable housing for rent or sale for thirty years, or (2) pay a fee of $100,000 per required unit into an affordable housing fund." *Id.* The court began its analysis of the Takings Clause claim by assessing whether the ordinance effected a taking. *Id.* at 1023-1025. The plaintiffs contended that the ordinance constituted a physical invasion of their property rights because it interfered with their right to set the price for which they would sell the property and because the ordinance required a recorded encumbrance on the property. *Id.* at 1025-26. The court rejected these arguments. For the first argument, the court found that, while owners typically had the right to set property prices, regulations such as rent controls are not per se takings. *Id.* at 1026 (collecting cases). For the second argument, the court found that the requirement to record the affordable-housing restriction did not rise to the level of creating a public property right or public easement, and thus did not constitute a physical taking either. *Id.* at 1027.

The Court agrees with the analysis of these three cases. The Court finds that the Mandatory Affordable Housing Ordinance, by requiring income restrictions on certain units and requiring the recording of a deed, does not constitute a physical invasion of property as required to establish a per se taking.[4] It also does not involve the kind of

---

[4] The Court shares the skepticism expressed in *Home Builders* regarding the impact on the analysis of a state prohibition on rent controls. *See* 213 F. Supp. 3d at 1028. Plaintiffs cite *Phillips v. Washington Legal Found.*, 524 U.S. 156, 164 (1998), for

monetary exaction that was at issue in *Koontz*. Thus, the Mandatory Affordable

Housing Ordinance is not subject to the unconstitutional conditions analysis under

*Nollan* and *Dolan*, and plaintiffs complaint must be dismissed insofar as it challenges

the Mandatory Affordable Housing Ordinance. Moreover, because the Mandatory

Affordable Housing Ordinance is an alternative to Linkage Fee Ordinance compliance,

Docket No. 11 at 7, ¶ 23, and because the Mandatory Affordable Housing Ordinance is

an alternative that does not violate *Nollan* and *Dolan*, the Linkage Fee Ordinance is not

an unconstitutional condition. *See Koontz*, 570 U.S. at 596 ("Had [plaintiff] been offered

at least one alternative that satisfied *Nollan* and *Dolan*, he would not have been

subjected to an unconstitutional condition."). The Court therefore finds that plaintiffs'

challenge to the Linkage Fee Ordinance must also be dismissed.

   The Court will grant Denver's motion and will dismiss plaintiffs' claim without

prejudice.

---

the proposition that the Court should consider state law in its analysis. Docket No. 19 at
10-11. In *Phillips*, there was no question that the government was obtaining property
without compensation. *See id.* at 159-163. The issue was whether the plaintiffs had an
interest in the property that was being taken, thus requiring an examination of state law.
*Id.* at 164-165. The Court finds the present situation to be different, as the relevant
question is whether the Mandatory Affordable Housing Ordinance constitutes a taking.
But even if state law impacted the analysis, it is not clear that it would make a difference
here. As plaintiffs note, Colo. Rev. Stat. § 38-12-301 restricts rent control in Colorado.
Docket No. 19 at 12. The Colorado Supreme Court has interpreted rent control to mean
"allowable rent capped at a fixed rate with only limited increases." *Town of Telluride v.
Lot Thirty-Four Venture, L.L.C.*, 3 P.3d 30, 35 (Colo. 2000). The Mandatory Affordable
Housing Ordinance restricts the sale or lease of the income-restricted units not based
on rent or sale price, but on the income level of the buyer or lessee. *See* Denver
Revised Muni. Code § 27-224. And although the law requires prices be kept
"affordable" to buyers and lessees of those income levels, *see id.* § 27-224(a), (f), it is
not clear to the Court that such requirements fall within the Colorado Supreme Court's
interpretation of the rent control law.

## IV.  CONCLUSION

It is therefore

**ORDERED** that Defendant's Motion to Dismiss Plaintiff's Second Amended

Complaint for Declaratory and Injunctive Relief [Docket No. 14] is **GRANTED**.  It is

further

**ORDERED** that plaintiffs' second amended complaint, Docket No. 11, is

**DISMISSED without prejudice**.  It is further

**ORDERED** that this case is closed.

DATED March 3, 2026.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge